PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.                                    No. 07-4348

RALPH ANTHONY ROSEBORO,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:06-cr-00005)

Argued: September 23, 2008

Decided: January 5, 2009

Before NIEMEYER, Circuit Judge,
HAMILTON, Senior Circuit Judge, and
T. S. ELLIS, III, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

Vacated and remanded by published opinion. Senior Judge
Hamilton wrote the opinion, in which Senior Judge Ellis
joined. Judge Niemeyer wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Ross Hall Richardson, FEDERAL DEFENDERS
OF WESTERN NORTH CAROLINA, INC., Charlotte, North

Carolina, for Appellant. Adam Christopher Morris, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Claire J. Rauscher, Executive Director, Kevin A. Tate, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

---

## OPINION

HAMILTON, Senior Circuit Judge:

The Armed Career Criminal Act (ACCA) imposes a mandatory minimum fifteen-year sentence on felons who unlawfully possess, among other things, firearms, and who also have three or more previous convictions for committing certain drug crimes or "violent felon[ies]." 18 U.S.C. § 924(e)(1). In *United States v. James*, this court held that a South Carolina failure to stop for a blue light violation, S.C. Code Ann. § 56-5-750(A), constitutes a violent felony under the ACCA. 337 F.3d 387, 390-91 (4th Cir. 2003). The principal issue presented in this appeal is whether the test we applied in *James* for determining when a crime constitutes a violent felony under the ACCA survives the United States Supreme Court's decision in *Begay v. United States*, 128 S. Ct. 1581 (2008). We conclude that it does not.

I

The relevant facts of this case are not in dispute. On January 23, 2006, a federal grand jury sitting in the Western District of North Carolina charged Ralph Roseboro with violating 18 U.S.C. § 922(g)(1), which prohibits felons from possessing, among other things, firearms. On June 29, 2006, a jury convicted Roseboro of this offense.

In preparation for sentencing, a probation officer prepared a presentence investigation report (PSR). The probation officer calculated Roseboro's Base Offense Level to be 14, United States Sentencing Commission, *Guidelines Manual* (USSG), § 2K2.1(a)(6). Two levels were added because the firearm Roseboro possessed was stolen. *Id.* § 2K2.1(b)(4). Because Roseboro possessed the firearm in connection with another felony offense, namely, burglary, Roseboro's Offense Level was increased by four more levels. *Id.* § 2K2.1(b)(5). Finally, because the probation officer determined that Roseboro obstructed justice, Roseboro's Offense Level was increased by two more levels, *id.* § 3C1.1, resulting in a Total Offense Level of 22. The Total Offense Level of 22, when coupled with a Criminal History Category VI, produced a sentencing range of 84 to 105 months' imprisonment.

Both the government and Roseboro filed objections to the PSR. The government objected to the PSR on the basis that it did not reflect that Roseboro was an Armed Career Criminal under the ACCA. Section 924(e)(1) provides:

> [A] person who violates section 922(g) of this title and has three previous convictions . . . for a violent felony . . . committed on occasions different from one another, such person shall be . . . imprisoned not less than fifteen years.

18 U.S.C. § 924(e)(1). The term "violent felony" is defined as any crime punishable by imprisonment for a term exceeding one year that either "has as an element the use, attempted use, or threatened use of physical force against the person of another," *id.* § 924(e)(2)(B)(i), or "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." *Id.* § 924(e)(2)(B)(ii). According to the government, Roseboro's three prior South Carolina failure to stop for a blue light convictions were violent felonies because each of

those convictions involved conduct that presented a serious potential risk of physical injury to another.[1]

Roseboro objected to the PSR on the basis that the § 2K2.1(b)(4) and § 2K2.1(b)(5) enhancements were not warranted. Consequently, Roseboro urged the probation officer to reduce his Total Offense Level by 6 levels, resulting in a Total Offense Level of 16, which when coupled with a Criminal History Category VI, resulted in a sentencing range of 46 to 57 months' imprisonment.

Roseboro also objected to the government's suggestion that he was an Armed Career Criminal. According to Roseboro, under the categorical approach, he was not eligible for any of the career offender enhancements (Armed Career Criminal or Career Offender) because none of his South Carolina failure to stop for a blue light violations were either a crime of violence or a violent felony.[2]

---

[1]In December 1996, Roseboro was convicted of a South Carolina failure to stop for a blue light violation and sentenced to two years' imprisonment, suspended on the completion of ninety days. In February 2001, Roseboro again was convicted for failing to stop for a blue light; this time he was sentenced to three years' imprisonment, suspended on the completion of one year. In March 2002, Roseboro yet again was convicted of failing to stop for a blue light and was sentenced to two years' imprisonment.

[2]Under the Sentencing Guidelines, a defendant who is a Career Offender is subject to a higher sentence. A defendant qualifies as a Career Offender if his instant felony offense and two of his prior felony offenses are either a crime of violence or a controlled substance offense. USSG § 4B1.1(a). Section 4B1.2 defines a crime of violence as

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

USSG § 4B1.2. Because the language defining a violent felony in § 924(e) is nearly identical to and materially indistinguishable from the language

The probation officer sided with the government and concluded that Roseboro was an Armed Career Criminal based on his conclusion that Roseboro's three South Carolina failure to stop for a blue light convictions were violent felonies. The effect of this conclusion had a significant impact on Roseboro's sentencing range. The PSR's recommended sentencing range moved from 84 to 105 months' imprisonment (Total Offense Level of 22/Criminal History Category VI) to 262 to 327 months' imprisonment (Total Offense Level of 34/Criminal History Category VI).

In preparation for sentencing, both the government and Roseboro filed sentencing memorandums. Roseboro argued, among other things, that his three prior South Carolina failure to stop for a blue light convictions were not violent felonies because the offenses did not "categorically meet the definition of a violent felony as defined in 18 U.S.C. § 924(e)." In response, the government contended that the issue was controlled by our decision in *James*, where we held that a South Carolina failure to stop for a blue light violation was a violent felony because the offense involved "the potential for serious injury to another." 337 F.3d at 391.

At sentencing, in arguing against the conclusion that he was an Armed Career Criminal, Roseboro rested on his pleadings and made a variety of arguments to the district court, all of which were rejected. Agreeing with both the probation officer and the government that Roseboro was an Armed Career Criminal, the district court calculated Roseboro's sentencing range to be 262 to 327 months' imprisonment. In sentencing Roseboro, the district court expressly considered the factors in 18 U.S.C. § 3553(a) and sentenced Roseboro to the low end of the sentencing range, 262 months' imprisonment.

defining a crime of violence in USSG § 4B1.2, we look to our case law interpreting both sections when examining whether a prior crime falls within these sections. *United States v. Johnson*, 246 F.3d 330, 333 (4th Cir. 2001).

Roseboro noted a timely appeal.

## II

## A

In *James*, we addressed the question of whether a South Carolina failure to stop for a blue light violation was a violent felony under the ACCA. In resolving this question, we first determined that, under South Carolina law, a failure to stop for a blue light violation was a crime punishable by a term of imprisonment exceeding one year. 337 F.3d at 390 (noting that a violation of § 56-5-750(A), first offense, is punishable by a term of imprisonment of up to three years). After examining the elements of a South Carolina failure to stop for a blue light violation, we determined that the offense did not have as an element the use, attempted use, or threatened use of physical force against another person. *Id.* Consequently, we turned to whether a South Carolina failure to stop for a blue light violation otherwise involved conduct that presented a serious potential risk of physical injury to another person. *Id.* In assessing this question, we applied a "'categorical approach, whereby the court looks only at the fact of conviction and the statutory definition of the offense, and not to the underlying facts of a specific conviction.'" *Id.* (quoting *United States v. Thomas*, 2 F.3d 79, 80 (4th Cir. 1993)).[3]

---

[3]The Supreme Court has allowed the consultation of additional materials when the statutory provision at issue defines multiple crimes, *Taylor v. United States*, 495 U.S. 575, 599 (1990), or in those cases "where the state statute is categorically overbroad—that is, where it is evident from the statutory definition of the state crime that some violations of the statute are 'crimes of violence' and others are not." *United States v. Diaz-Ibarra*, 522 F.3d 343, 348 (4th Cir. 2008). This is commonly referred to as the "modified categorical approach." *Id.* (citation and internal quotation marks omitted). In cases involving guilty pleas under the modified categorical approach, courts look to "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or

Under this approach, we asked whether the statute at issue "'proscribe[d] generic conduct with the potential for serious physical injury to another.'" *Id.* (quoting *United States v. Custis*, 988 F.2d 1355, 1363 (4th Cir. 1993)); *see also United States v. Hairston*, 71 F.3d 115, 118 (4th Cir. 1995) (holding that any escape, even an escape by stealth, created a serious potential risk of physical injury to another and, therefore, an escape offense, however effected, is a violent felony under § 924(e)(1)(B)(ii)). In concluding that a South Carolina failure to stop for a blue light violation posed a potential for serious physical injury to another, we stated:

> Applying the categorical approach, we find that failing to stop for a blue light generally proscribes conduct that poses the potential for serious injury to another.

> Most cases of failing to stop for a blue light involve the deliberate choice by the driver to disobey the police officer's signal. This disobedience poses the threat of a direct confrontation between the police officer and the occupants of the vehicle, which, in turn, creates a potential for serious physical injury to the officer, other occupants of the vehicle, and even bystanders.

*James*, 337 F.3d at 390-91.

---

to some comparable judicial record of this information." *Shepard v. United States*, 544 U.S. 13, 26 (2005). In other cases, courts look to the jury instructions or the charging documents. *United States v. Thompson*, 421 F.3d 278, 281-82 (4th Cir. 2005). The Supreme Court made clear that the *strict* limits on the type of evidence that we may consider under the modified categorical approach are of constitutional dimension—they prevent us from usurping the jury's role (and thus violating the defendant's Sixth Amendment rights) by finding facts about a past crime under the guise of determining the nature of the crime. *Shepard*, 544 U.S. at 24-26.

If the analysis set forth in *James* is controlling, the outcome of this case is straightforward. Unquestionably, under *James*, Roseboro's three prior South Carolina failure to stop for a blue light violations are violent felonies. The question we must address is whether the Supreme Court's decision in *Begay* fundamentally altered the § 924(e)(2)(B)(ii) inquiry such that the test applied in *James* does not control the outcome of this case. To answer this question, we need to turn to the Supreme Court's decision in *Begay*.

In *Begay*, the Supreme Court addressed whether the offense of driving under the influence of alcohol (DUI) was a violent felony under the ACCA. The DUI statute at issue in *Begay* was out of the State of New Mexico, which made it a crime to "'drive a vehicle within [the] state' if the driver 'is under the influence of intoxicating liquor' (or has an alcohol concentration of .08 or more in his blood or breath within three hours of having driven the vehicle resulting from 'alcohol consumed before or while driving the vehicle')." 128 S. Ct. at 1584 (quoting N.M. Stat. §§ 66-8-102(A) and (C)). In determining whether a New Mexico DUI offense was a violent felony under the ACCA, the Court considered the offense "generically," *id.*; that is, the Court applied the categorical approach by examining the statute "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Id.*

In examining the New Mexico DUI statute in the generic sense, the Court first observed that the offense did not have as an element the use, attempted use, or threatened use of physical force against another person under § 924(e)(2)(B)(i). *Id.* Critically, the Court assumed that the Tenth Circuit was correct in concluding that "DUI involves conduct that 'presents a serious potential risk of physical injury to another'" under § 924(e)(2)(B)(ii), noting that DUI is an "extremely dangerous crime." *Id.* Nevertheless, the Court concluded that a DUI offense fell outside of § 924(e)(2)(B)(ii)'s otherwise

clause because the offense was "simply too unlike the provision's listed examples for us to believe that Congress intended the provision to cover it." *Id.*

In reaching this conclusion, the Supreme Court observed that § 924(e)(2)(B)(ii) listed the types of crimes (burglary, arson, extortion, or crimes involving the use of explosives) that fell within the statute's scope. *Id.* at 1585. According to the Court, the presence of burglary, arson, extortion, and crimes involving the use of explosives indicated that the statute only covered "similar crimes, rather than every crime that 'presents a serious potential risk of physical injury to another.'" *Id.* (quoting § 924(e)(2)(B)(ii)). The Court reasoned that, if Congress meant to cover all crimes that posed a serious potential risk of physical injury to another, it was "hard to see why it would have needed to include the examples at all." *Id.* The Court also reasoned that, if Congress meant § 924(e)(2)(B)(ii) to include all crimes that pose risk, it would not have included § 924(e)(2)(B)(i), because a crime that has as an element the use, attempted use, or threatened use of physical force against another person is likely to create a serious potential risk of physical injury to another. *Id.*

The Court in *Begay* also rejected the notion that Congress included the examples in § 924(e)(2)(B)(ii) for quantitative purposes, *e.g.*, intending them to "demonstrate no more than the degree of risk sufficient to bring a crime within [§ 924(e)(2)(B)(ii)'s] scope." *Id.* The Court reasoned that, if Congress intended to focus solely on the degree of risk involved, it would have "chosen examples that better illustrated the 'degree of risk' it had in mind." *Id.*

In light of these considerations, and to give effect to every clause and word in § 924(e)(2)(B)(ii), the Court concluded that the examples in § 924(e)(2)(B)(ii) should be read as limiting the crimes that the statute covers to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves. *Id.* The Court also observed that its

reading of the statute was supported by § 924(e)(2)(B)(ii)'s legislative history. *Id.* at 1585-86.

Turning to the question of whether a New Mexico DUI offense was similar in kind as well as in degree of risk posed to the listed examples in § 924(e)(2)(B)(ii), the Court first observed that a New Mexico DUI offense was different from the enumerated crimes in § 924(e)(2)(B)(ii) in one critical respect. *Id.* at 1586. The enumerated crimes in § 924(e)(2)(B)(ii) "all typically involve[d] purposeful, violent, and aggressive conduct." *Id.* (citation and internal quotation marks omitted). According to the Court, the enumerated crimes, which are all committed with purpose, violence, and aggression, made it more likely that the defendant would use a firearm during the commission of a later offense. *Id.*

In contrast to the enumerated crimes in § 924(e)(2)(B)(ii), the Court observed that a DUI offense typically did not involve purposeful, violent, and aggressive conduct. *Id.* Rather, the Court observed that a DUI offense was more comparable to a strict liability crime, because to prove a DUI offense, the prosecution need not prove any criminal intent at all. *Id.* at 1586-87. In other words, while a drunk driver may consume alcohol on purpose and perhaps later drive under the influence of that alcohol on purpose, the prosecution is not required to prove that the defendant committed the crime purposefully or deliberately because the offense can be committed accidentally or negligently. *Id.* at 1587.

The fact that a DUI offense can be committed accidentally or negligently played a critical role in the Court's decision. The Court observed that the ACCA focused on "the special danger created when a particular type of offender—a violent criminal or drug trafficker—possesses a gun." *Id.* Which defendants are violent depends on their prior crimes. The more serious the prior crime, the greater the threat the defendant poses when he later possesses a firearm. *Id.* As the Court observed:

> In this respect—namely a prior crime's relevance to the possibility of future danger with a gun—crimes involving intentional or purposeful conduct (as in burglary and arson) are different than DUI, a strict liability crime. In both instances, the offender's prior crimes reveal a degree of callousness toward risk, but in the former instance they also show an increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger.

*Id.*

Thus, the line drawn in the sand by the Court in *Begay* was that prior crimes that involved purposeful, violent, and aggressive conduct increased the likelihood that a defendant would use a gun during the commission of the later offense, while a prior crime that did not involve purposeful, violent, and aggressive conduct did not increase such a likelihood. To view the matter any differently, the Court observed, would bring a host of crimes into § 924(e)(2)(B)(ii)'s rubric that "though dangerous, are not typically committed by those whom one normally labels 'armed career criminals.'" *Id.* (citing Ark. Code Ann. § 8-4-103(a)(2)(A)(ii) (which applies to reckless polluters); 33 U.S.C. § 1319(c)(1) (which applies to individuals who negligently introduce pollutants into the sewer system); 18 U.S.C. § 1365(a) (which applies to individuals who recklessly tamper with consumer products); and 18 U.S.C. § 1115 (which applies to seamen whose inattention to duty causes serious accidents)).

In making this distinction between offenses that are purposeful, violent, and aggressive on the one hand, and offenses that do not involve one of these attributes on the other hand, the Court recognized that a defendant with a history of DUI may later pull a firearm's trigger. *Id.* at 1588. Indeed, the defendant in *Begay*, in committing his § 922(g)(1) offense, pointed a rifle at his sister and pulled the trigger several times,

but the rifle would not fire. *United States v. Begay*, 470 F.3d 964, 965 (10th Cir. 2006). However, this fact was not enough to sway the Court from holding that

> for purposes of the particular statutory provision before us, a prior record of DUI, a strict liability crime, differs from a prior record of violent and aggressive crimes committed intentionally such as arson, burglary, extortion, or crimes involving the use of explosives. The latter are associated with a likelihood of future violent, aggressive, and purposeful "armed career criminal" behavior in a way that the former are not.

*Begay*, 128 S. Ct. at 1588.

## B

The Supreme Court's test applied in *Begay* is markedly different than the test we applied in *James*. Under *James*, an offense presented a serious potential risk of physical injury to another if the offense conduct had the potential for serious physical injury to another. 337 F.3d at 390. The Supreme Court in *Begay*, however, explicitly rejected this inquiry as outcome determinative, observing that the proper inquiry involved far more than an analysis of the risk associated with the prior crime. *Begay*, 128 S. Ct. at 1584 (where the Court assumed that the Tenth Circuit was correct in concluding that "DUI involves conduct that 'presents a serious potential risk of physical injury to another'"); *id.* at 1587 ("The dissent's approach, on the other hand, would likely include these crimes within the statutory definition of 'violent felony,' along with any other crime that can be said to present 'a serious potential risk of physical injury.' . . . . And it would do so because it believes such a result is compelled by the statute's text. . . . But the dissent's explanation does not account for a key feature of that text—namely, the four example crimes intended to illustrate what kind of 'violent felony' the

statute covers."); *id.* at 1589 (Scalia, J., dissenting) ("There is simply no basis (other than the necessity of resolving the present case) for holding that the enumerated and unenumerated crimes must be similar in respects *other than the degree of risk that they pose*."). Rather, the proper inquiry focuses on the similarity between the prior crime and the enumerated crimes in § 924(e)(2)(B)(ii), asking whether the prior crime involved purposeful, violent, and aggressive conduct, which would demonstrate a likelihood that the defendant would use a firearm during the commission of a crime. *Id.* at 1585-88. In *James*, we neither compared the similarity between a South Carolina failure to stop for a blue light violation to the enumerated crimes in § 924(e)(2)(B)(ii), nor asked whether the South Carolina statute at issue involved purposeful, violent, and aggressive conduct. Because we are now bound to apply the *Begay* framework, the test we espoused in *James* is no longer controlling. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 n.2 (4th Cir. 2002) ("[A] panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting *en banc* can do that.") (citation and internal quotation marks omitted).

## C

In assessing whether a South Carolina failure to stop for a blue light violation constitutes a violent felony under § 924(e)(2)(B)(ii), per *Begay*, we must first determine whether the statute at issue involves purposeful, violent, and aggressive conduct, such that the offense can be found similar to the enumerated crimes in § 924(e)(2)(B)(ii). South Carolina Code § 56-5-750(A) provides:

> In the absence of mitigating circumstances, it is unlawful for a motor vehicle driver, while driving on a road, street, or highway of the State, to fail to stop when signaled by a law enforcement vehicle by means of a siren or flashing light. An attempt to

increase the speed of a vehicle or in other manner avoid the pursuing law enforcement vehicle when signaled by a siren or flashing light is prima facie evidence of a violation of this section. Failure to see the flashing light or hear the siren does not excuse a failure to stop when the distance between the vehicles and other road conditions are such that it would be reasonable for a driver to hear or see the signals from the law enforcement vehicle.

S.C. Code Ann. § 56-5-750(A).

The South Carolina Supreme Court, and for that matter this court in *James*, has indicated that, in a § 56-5-750(A) prosecution, the State must prove the following elements: "(1) that the defendant was driving a motor vehicle; (2) that he was driving it on a road, street or highway of this State; (3) that he was signaled to stop by a law-enforcement vehicle by means of a siren or flashing light; and (4) that he did not stop." *State v. Hoffman*, 186 S.E.2d 421, 425 (S.C. 1972); *see also James*, 337 F.3d at 390. These four elements appear to be routinely used in § 56-5-750(A) prosecutions in South Carolina state courts. *See* Judge Ralph King Anderson, Jr., *South Carolina Request For Charge—Criminal*, § 2-60 (2007).

In order for the State to satisfy the first two of these four elements, the State must show that the defendant was driving a motor vehicle on a road, street, or highway in South Carolina. The third element requires the State to show that the law enforcement officer signaled the defendant to stop. The final element requires the State to prove that the defendant did not stop after he was signaled by the law enforcement officer to do so.

From the above elements, it is clear that, to prove a § 56-5-750(A) violation, the State does not have to prove that the defendant acted with criminal intent. Indeed, we implicitly recognized this fact in *James*, where we observed that "[m]ost

cases of failing to stop for a blue light involve the deliberate choice by the driver to disobey the police officer's signal." 337 F.3d at 391. It follows from our use of the words "[m]ost cases" that some South Carolina failure to stop for a blue light violations involve conduct where the defendant does not make a deliberate choice to avoid the pursuing law enforcement officer; rather, he fails to stop on account of some negligent act.

More telling, the elements as set forth by the South Carolina Supreme Court simply do not require that the defendant act either willfully or knowingly. The absence of either a willful or knowing requirement strongly suggests that the South Carolina legislature intended a violation to rest in the event that the defendant acted either recklessly or negligently. *See State v. Ferguson*, 395 S.E.2d 182, 184 (S.C. 1990) (holding that S.C. Code Ann. § 44-53-370, which provides in relevant part that it is unlawful for any person to manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance, was not a strict liability crime; rather, the State was required to prove the defendant was at least criminally negligent); *State v. Jenkins*, 294 S.E.2d 44, 45-46 (S.C. 1982) ("By failing to include 'knowingly' or other apt words to indicate criminal intent or motive, we think the legislature intended that one who simply, without knowledge or intent that his act is criminal, fails to provide proper care and attention for a child or helpless person of whom he has legal custody, so that the life, health, and comfort of that child or helpless person is endangered or is likely to be endangered, violates § 16-3-1030 of the Code.").

To be sure, § 56-5-750(A) unquestionably covers both intentional and unintentional conduct, as the word "fail," unlike the word "refuse," can refer to both intentional and unintentional acts. For example, a defendant can violate the statute by intentionally failing to stop. In the event the State shows that the defendant intentionally failed to stop by attempting to avoid the law enforcement vehicle by speeding

up (or in some other manner), the State enjoys the rebuttable presumption that the defendant violated the statute. *See* S.C. Code Ann. § 56-5-750(A) ("An attempt to increase the speed of a vehicle or in other manner avoid the pursuing law enforcement vehicle when signaled by a siren or flashing light is prima facie evidence of a violation of this section."). However, when the defendant negligently fails to stop, say, because he was wearing headphones through which he played music on his Ipod too loudly, the State does not enjoy this presumption, but the State still is free to prove the defendant violated the statute, even though the defendant failed to stop simply because of his own negligent behavior.[4]

Moreover, § 56-5-750(A) stands in stark contrast to the South Carolina statute governing resisting arrest, and numerous state statutes governing failing to stop for a blue light. South Carolina's resisting arrest statute clearly requires the defendant to knowingly and willfully resist the arrest. *See* S.C. Code Ann. § 16-9-320(A) (defining resisting arrest as "knowingly and wilfully . . . resist[ing] an arrest"). Laws from over forty states clearly require that the failure to stop for a blue light violation be purposeful.[5] Section 16-9-320(A) of the

---

[4]The indictments in Roseboro's three prior § 56-5-750(A) cases suggest that the state prosecutors were aware that the State could proceed under either a negligence or intent theory. One indictment alleges that Roseboro willfully violated § 56-5-750(A), the other two do not.

[5]*See* Ala. Code § 32-5A-193(a) ("Any driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle, when given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a misdemeanor."); Alaska Stat. § 28.35.182(b) ("A person commits the offense of failure to stop at the direction of a peace officer in the second degree if the person, while driving or operating a vehicle or motor vehicle or while operating an aircraft or watercraft, knowingly fails to stop as soon as practical and in a reasonably safe manner under the circumstances when requested or signaled to do so by a peace officer."); Ariz. Rev. Stat. § 28-1595(A) ("The operator of a motor vehicle who knowingly fails or refuses to bring the operator's motor vehicle to a stop after being given a visual

or audible signal or instruction by a peace officer or duly authorized agent of a traffic enforcement agency is guilty of a class 2 misdemeanor."); Ark. Code Ann. § 5-54-125(a) ("If a person knows that his or her immediate arrest or detention is being attempted by a duly authorized law enforcement officer, it is the lawful duty of the person to refrain from fleeing, either on foot or by means of any vehicle or conveyance."); Cal. Vehicle Code § 2800.1(a) ("Any person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor."); Col. Rev. Stat. § 18-9-116.5(1) ("Any person who, while operating a motor vehicle, knowingly eludes or attempts to elude a peace officer also operating a motor vehicle, and who knows or reasonably should know that he or she is being pursued by said peace officer, and who operates his or her vehicle in a reckless manner, commits vehicular eluding."); Del. Code Ann. Title 21 § 4103(b) ("Any driver who, having received a visual or audible signal from a police officer identifiable by uniform, by motor vehicle or by a clearly discernible police signal to bring the driver's vehicle to a stop, operates the vehicle in disregard of the signal or interferes with or endangers the operation of the police vehicle or who increases speed or extinguishes the vehicle's lights and attempts to flee or elude the police officer shall be guilty of a class G felony."); Fla. Stat. Ann. § 316.1935(1) ("It is unlawful for the operator of any vehicle, having knowledge that he or she has been ordered to stop such vehicle by a duly authorized law enforcement officer, willfully to refuse or fail to stop the vehicle in compliance with such order or, having stopped in knowing compliance with such order, willfully to flee in an attempt to elude the officer, and a person who violates this subsection commits a felony of the third degree."); Ga. Code Ann. § 40-6-395(a) ("It shall be unlawful for any driver of a vehicle willfully to fail or refuse to bring his or her vehicle to a stop or otherwise to flee or attempt to elude a pursuing police vehicle or police officer when given a visual or an audible signal to bring the vehicle to a stop."); Haw. Rev. Stat. § 710-1027(1) ("A person commits the offense of resisting an order to stop a motor vehicle if the person intentionally fails to obey a direction of a law enforcement officer, acting under color of the law enforcement officer's official authority, to stop the person's vehicle."); Idaho Code Ann. § 49-1404(1) ("Any driver of a motor vehicle who wilfully flees or attempts to elude a pursuing police vehicle when given a visual or audible signal to bring the vehicle to a stop, shall

be guilty of a misdemeanor."); 625 Ill. Comp. Stat. 5/11-204(a) ("Any driver or operator of a motor vehicle who, having been given a visual or audible signal by a peace officer directing such driver or operator to bring his vehicle to a stop, wilfully fails or refuses to obey such direction, increases his speed, extinguishes his lights, or otherwise flees or attempts to elude the officer, is guilty of a Class A misdemeanor."); Ind. Code § 35-44-3-3(b)(1)(A) (criminalizing the use of a vehicle to knowingly or intentionally flee from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop); Iowa Code Ann. § 321.279(1) ("The driver of a motor vehicle commits a serious misdemeanor if the driver willfully fails to bring the motor vehicle to a stop or otherwise eludes or attempts to elude a marked official law enforcement vehicle driven by a uniformed peace officer after being given a visual and audible signal to stop."); Kan. Stat. Ann § 8-1568(a) ("Any driver of a motor vehicle who willfully fails or refuses to bring such driver's vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police vehicle or police bicycle, when given visual or audible signal to bring the vehicle to a stop, shall be guilty as provided by subsection (c)(1), (2) or (3)."); Ky. Rev. Stat. Ann. § 520.095(1)(a) ("When, while operating a motor vehicle with intent to elude or flee, the person knowingly or wantonly disobeys a direction to stop his or her motor vehicle."); La. Rev. Stat. Ann. § 14:108.1(A) ("No driver of a motor vehicle shall intentionally refuse to bring a vehicle to a stop knowing that he has been given a visual and audible signal to stop by a police officer when the officer has reasonable grounds to believe that the driver has committed an offense. The signal shall be given by an emergency light and a siren on a vehicle marked as a police vehicle."); Md. Code Ann. §§ 21-904(c) and (c)(1) ("If a police officer gives a visual or audible signal to stop and the police officer, whether or not in uniform, is in a vehicle appropriately marked as an official police vehicle, a driver of a vehicle may not attempt to elude the police officer by . . . [w]illfully failing to stop the driver's vehicle."); Mich. Comp. Laws § 257.602a(1) ("A driver of a motor vehicle who is given by hand, voice, emergency light, or siren a visual or audible signal by a police or conservation officer, acting in the lawful performance of his or her duty, directing the driver to bring his or her motor vehicle to a stop shall not willfully fail to obey that direction by increasing the speed of the motor vehicle, extinguishing the lights of the motor vehicle, or otherwise attempting to flee or elude the officer."); Minn Stat. § 609.487(1) (defining "flee[ing]" as "increas[ing]

speed, extinguish[ing] motor vehicle headlights or taillights, refus[ing] to stop the vehicle, or us[ing] other means with intent to attempt to elude a peace officer following a signal given by any peace officer to the driver of a motor vehicle"); Miss. Code Ann. § 97-9-72(1) ("The driver of a motor vehicle who is given a visible or audible signal by a law enforcement officer by hand, voice, emergency light or siren directing the driver to bring his motor vehicle to a stop when such signal is given by a law enforcement officer acting in the lawful performance of duty who has a reasonable suspicion to believe that the driver in question has committed a crime, and who willfully fails to obey such direction shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine not to exceed One Thousand Dollars ($1,000.00) or imprisoned in the county jail for a term not to exceed six (6) months, or both."); Mo. Rev. Stat. § 43.170 ("It shall be the duty of the operator or driver of any vehicle or the rider of any animal traveling on the highways of this state to stop on signal of any member of the patrol and to obey any other reasonable signal or direction of such member of the patrol given in directing the movement of traffic on the highways. Any person who willfully fails or refuses to obey such signals or directions or who willfully resists or opposes a member of the patrol in the proper discharge of his duties shall be guilty of a misdemeanor and on conviction thereof shall be punished as provided by law for such offenses."); Mont. Code Ann. § 61-8-316(a) ("A person operating a motor vehicle commits the offense of fleeing from or eluding a peace officer if a uniformed peace officer operating a police vehicle in the lawful performance of the peace officer's duty gives the person a visual or audible signal by hand, voice, emergency light, or siren directing the person to stop the motor vehicle and the person knowingly fails to obey the signal by increasing the speed of the motor vehicle, continuing at a speed that is 10 or more miles an hour above the applicable speed limit, extinguishing the motor vehicle's lights, or otherwise fleeing from, eluding, or attempting to flee from or elude the peace officer."); Nev. Rev. Stat. § 484.348(1) ("[T]he driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a peace officer in a readily identifiable vehicle of any police department or regulatory agency, when given a signal to bring his vehicle to a stop is guilty of a misdemeanor."); N.H. Rev. Stat. Ann. §§ 265:4(I) and (I)(c) ("No person, while driving or in charge of a vehicle, shall . . . [p]urposely neglect to stop when signaled to stop by any law enforcement officer . . . or otherwise willfully attempt to elude pursuit by a law enforcement officer by increasing speed, extinguishing headlamps while still in motion or abandoning a vehicle while being pursued."); N.J. Stat. Ann. § 2C:29-2(b) ("Any person, while operating a motor vehicle . . . who knowingly flees

or attempts to elude any police or law enforcement officer after having received any signal from such officer to bring the vehicle . . . to a full stop commits a crime of the third degree."); N.M. Stat. § 30-22-1(c) (stating that the crime of resisting, evading, or obstructing an officer consists, among other things, of "willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop"); N.Y. Penal Law § 270.25 ("A person is guilty of unlawful fleeing a police officer in a motor vehicle in the third degree when, knowing that he or she has been directed to stop his or her motor vehicle by a uniformed police officer or a marked police vehicle by the activation of either the lights or the lights and siren of such vehicle, he or she thereafter attempts to flee such officer or such vehicle by driving at speeds which equal or exceed twenty-five miles per hour above the speed limit or engaging in reckless driving."); N.C. Gen. Stat. § 20-141.5(a) ("It shall be unlawful for any person to operate a motor vehicle on a street, highway, or public vehicular area while fleeing or attempting to elude a law enforcement officer who is in the lawful performance of his duties."); N.D. Cent. Code § 39-10-71(1) ("Any driver of a motor vehicle who willfully fails or refuses to bring the vehicle to a stop, or who otherwise flees or attempts to elude, in any manner, a pursuing police vehicle or peace officer, when given a visual or audible signal to bring the vehicle to a stop, is guilty of a class A misdemeanor for a first offense and a class C felony for a subsequent offense within three years."); Ohio Rev. Code Ann. § 2921.331(B) ("No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop."); Ok. Stat. Ann. § 540A(A) ("Any operator of a motor vehicle who has received a visual and audible signal, a red light and a siren from a peace officer driving a motor vehicle showing the same to be an official police, sheriff, highway patrol or state game ranger vehicle directing the operator to bring the vehicle to a stop and who willfully increases the speed or extinguishes the lights of the vehicle in an attempt to elude such peace officer, or willfully attempts in any other manner to elude the peace officer, or who does elude such peace officer, is guilty of a misdemeanor."); Or. Rev. Stat. § 811.540 (requiring the state to prove that the defendant knowingly fled or attempted to flee a pursuing police officer); 30 Pa. Stat. Ann. § 906(a) ("A person who has been given a visual or audible signal to stop by a person authorized to enforce this title and who willfully fails or refuses to bring his vehicle or boat to a stop or who otherwise flees or attempts to elude a pursuing officer or enforcement vehicle or boat commits a summary offense of the first degree."); R.I. Gen. Laws § 31-27-4 (requiring the state to prove that the defendant oper-

South Carolina Code and the vast majority of failure to stop
for blue light laws from across the Nation strongly suggest

---

ated a vehicle in an "attempt to elude or flee from a traffic officer or police
vehicle"); S.D. Codified Laws § 32-33-18 ("Any driver of a vehicle who
intentionally fails or refuses to bring a vehicle to a stop, when given visual
or audible signal to bring the vehicle to a stop, is guilty of failure to stop
at the signal of a law enforcement officer."); Tenn. Code Ann. § 39-16-
603(b)(1) ("It is unlawful for any person, while operating a motor vehicle
on any street, road, alley or highway in this state, to intentionally flee or
attempt to elude any law enforcement officer, after having received any
signal from such officer to bring the vehicle to a stop."); Tex. Transporta-
tion Code § 545.421(a) ("A person commits an offense if the person oper-
ates a motor vehicle and wilfully fails or refuses to bring the vehicle to a
stop or flees, or attempts to elude, a pursuing police vehicle when given
a visual or audible signal to bring the vehicle to a stop."); Va. Code Ann.
§ 46.2-817(A) ("Any person who, having received a visible or audible sig-
nal from any law-enforcement officer to bring his motor vehicle to a stop,
drive such motor vehicle in a willful and wanton disregard of such signal
or who attempts to escape or elude such law-enforcement officer, is guilty
of a Class 2 misdemeanor."); Wash. Rev. Code § 46.61.024(1) ("Any
driver of a motor vehicle who willfully fails or refuses to immediately
bring his vehicle to a stop and who drives his vehicle in a reckless manner
while attempting to elude a pursuing police vehicle, after being given a
visual or audible signal to bring the vehicle to a stop, shall be guilty of a
class C felony."); W. Va. Code § 61-5-17(e) ("Any person who intention-
ally flees or attempts to flee in a vehicle from any law-enforcement offi-
cer, probation officer or parole officer acting in his or her official capacity,
after the officer has given a clear visual or audible signal directing the per-
son to stop, is guilty of a misdemeanor."); Wis. Stat. § 346.04(3) ("No
operator of a vehicle, after having received a visual or audible signal from
a traffic officer, or marked police vehicle, shall knowingly flee or attempt
to elude any traffic officer by willful or wanton disregard of such signal
so as to interfere with or endanger the operation of the police vehicle, or
the traffic officer or other vehicles or pedestrians, nor shall the operator
increase the speed of the operator's vehicle or extinguish the lights of the
vehicle in an attempt to elude or flee."); Wyo. Stat. Ann. § 31-5-225(a)
("Any driver of a motor vehicle who willfully fails or refuses to bring his
vehicle to a stop, or who otherwise flees or attempts to elude a pursuing
police vehicle, when given visual or audible signal to bring the vehicle to
a stop, is guilty of a misdemeanor.").

that the South Carolina legislature easily could have required a § 56-5-750(A) violation to be premised only upon a showing that the defendant acted purposefully, but chose not to do so.

Like South Carolina, other states permit a failure to stop for a blue light violation to rest on proof that the defendant acted negligently. *See, e.g.*, Mass. Gen. Laws Chapter 90 § 25 ("Any person who, while operating or in charge of a motor vehicle, . . . shall refuse or neglect to stop when signaled to stop by any police officer who is in uniform or who displays his badge conspicuously on the outside of his outer coat or garment, . . . shall be punished by a fine of one hundred dollars."); Vt. Stat. Ann. Title 23 § 1133(a) ("No operator of a motor vehicle shall fail to bring his or her vehicle to a stop when signaled to do so by an enforcement officer.").

In *State v. Roy*, 557 A.2d 884 (Vt. 1989), the Vermont Supreme Court dealt with a similar statute to the one before this court. Under Vermont law, a person is prohibited from failing to stop a motor vehicle when signaled to do so by a law enforcement officer. *Id.* at 889. The defendant argued that the State of Vermont was required to prove that he had knowledge that he was being signaled to stop by a law enforcement officer displaying a flashing light and sounding a siren. *Id.* The *Roy* court rejected this contention, concluding that Vermont's failure to stop for a blue light statute was a strict liability crime. *Id.* at 890. In so holding, the *Roy* court principally relied on the Vermont legislature's failure to include an intent element in the statutory definition. *Id.* at 889-90.

Although the government openly conceded in its brief that § 56-5-750(A) was a "strict liability-like" statute, Appellee's Br. at 22, in other submissions to this court, it suggested that the phrase "[i]n the absence of mitigating circumstances" in § 56-5-750(A) indicates that the South Carolina legislature intended § 56-5-750(A) to cover only knowing and willful

acts. The problem for the government's position is the phrase "[i]n the absence of mitigating circumstances" allows for a defense to both intentional *and* unintentional (negligent) conduct. For example, if a defendant intentionally avoids stopping once signaled to do so, a mitigating circumstance may be his reasonable belief that he was being pursued by somebody other than a law enforcement officer. *Cf.* Va. Code Ann. § 46.2-817(A) ("It shall be an affirmative defense . . . if the defendant shows he reasonably believed he was being pursued by a person other than a law-enforcement officer."); *see also* South Carolina Department of Public Safety, General Highway Safety, *Advice For Driving on South Carolina Roads*, available at *http://www.schp.org/general_hwy_tips.pdf* ("How to verify that you're being pulled over by a law enforcement officer: Look for a flashing blue light and try to identify the driver and ascertain that he/she is wearing a uniform. Make sure that the vehicle is marked properly identifying it as a police vehicle. If it is not, the officer should turn on his interior light and make it known to you that he is a police officer. Pull over to the right side of the road when you feel it is safe to do so."). At the same time, our Ipod defendant would be free to assert as a mitigating circumstance that the road conditions were such that a reasonable driver would not have heard the law enforcement officer's siren or seen his blue lights, notwithstanding his negligent conduct. *See* S.C. Code Ann. § 56-5-750(A) ("Failure to see the flashing light or hear the siren does not excuse a failure to stop when the distance between the vehicles and other road conditions are such that it would be reasonable for a driver to hear or see the signals from the law enforcement vehicle."). We can think of other examples where the presence of a mitigating circumstance might excuse the defendant's intentional and unintentional conduct. But such further examples would only belabor the point. We are dealing with what essentially is a categorically overbroad statute, allowing conviction for both intentional and unintentional conduct. Because it is not clear from the record whether Roseboro's § 56-5-750(A)'s convictions involve intentional or unintentional conduct, a remand is

appropriate to allow for the district court to consult such additional materials as may be appropriate under *Taylor* and *Shepard* and determine from those materials whether these convictions involved intentional violations of § 56-5-750(A). *See United States v. Williams*, 537 F.3d 969, (8th Cir. 2008) (vacating, post-*Begay*, defendant's auto theft conviction and remanding to allow district court to consider permissible materials to determine whether the defendant's conviction was a crime of violence). In the event the consultation of these additional materials establishes that Roseboro's convictions involved *intentional* violations of § 56-5-750(A), the district court would be free to conclude that the convictions are violent felonies under § 924(e)(2)(B)(ii). The intentional act of disobeying a law enforcement officer by refusing to stop for his blue light signal, without justification, is inherently an aggressive and violent act, *see United States v. Spells*, 537 F.3d 743, 752 (7th Cir. 2008) (holding, post-*Begay*, knowingly and intentionally fleeing (with the use of a vehicle) from a law enforcement officer is a purposeful, aggressive, and violent act), and, therefore, a violent felony under the ACCA.[6]

---

[6]Relying on *James v. United States*, 127 S. Ct. 1586 (2007), the government also contends that, because in most cases a § 56-5-750(A) violation involves intentional conduct instead of negligent conduct, a premise we are willing to accept for purposes of this argument, any violation of that statute is deemed a purposeful violation. In *James*, the Supreme Court addressed whether the Florida offense of attempted burglary otherwise involved conduct that presented a serious potential risk of physical injury to another under § 924(e)(2)(B)(ii). The first step in the Court's analysis was to define the predicate crime. This step was critical because Florida's attempt statute only required the defendant to take an act toward the commission of the crime, which the Court recognized could allow for an attempted burglary conviction to be premised on mere preparatory activity that posed no real danger of harm to others. *Id.* at 1594. Because the Florida Supreme Court had consistently required an overt act directed toward entering or remaining in a structure in an attempted burglary prosecution, the Court was able to use that definition, instead of the broader definition in the attempt statute, and examine whether conduct, in the main, that formed a violation of that narrow definition presented a serious potential

## D

We also note that our decision today is consistent with decisions from our sister circuits. These decisions make clear that when a statute does not *require* deliberate or purposeful conduct, a conviction under such a statute will not be considered a violent felony under the ACCA or a crime of violence under the Sentencing Guidelines. For example, in *United States v. Archer*, 531 F.3d 1347 (11th Cir. 2008), the district court sentenced the defendant as a Career Offender based, in part, on his prior Florida conviction for carrying a concealed weapon. *Id.* at 1348. The Eleventh Circuit affirmed, but the Supreme Court vacated the defendant's sentence and remanded the case for further consideration in light of *Begay*. *Id.* On remand from the Supreme Court, the *Archer* court held that the defendant's Florida conviction for carrying a concealed weapon was not a crime of violence and, therefore, the defendant was not a Career Offender under the Sentencing Guidelines. *Id.* at 1349-52.

---

risk of physical injury to another. *Id.* at 1594-97. In this case, unlike *James*, we do not have a limiting definition from the state's highest court ruling out the application of the statute in an overly broad manner. The South Carolina Supreme Court has not indicated that the State must always prove intent in a § 56-5-750(A) prosecution. Because, at its core, § 56-5-750(A) allows for a conviction based on negligent conduct, the categorical approach demands that we ask whether negligent conduct, in the main, that violates § 56-5-750(A) presents a serious potential risk of physical injury to another. The correct inquiry simply does not turn, as the government would have it, on whether more violations of § 56-5-750(A) are of the intentional genre. If this were the case, it would not have been necessary for the Court in *James* to look to the narrow construction of attempted burglary, because, in the main, most attempted burglaries involve much more than mere preparatory conduct. Moreover, the government's position creates serious tension with *Begay*, because it is highly unlikely that the Supreme Court would countenance the application of the ACCA to a case where the charging documents, plea colloquy, and/or jury instructions made it clear that the defendant acted negligently.

In applying *Begay*, the *Archer* court assessed whether carrying a concealed firearm is similar in kind and degree to the crimes of burglary of a dwelling, arson, extortion, and crimes involving the use of explosives. *Id.* at 1350. The court noted that the Florida statute at issue prohibited a person from carrying a concealed firearm on or about his person. *Id.* In so noting, the court concluded that carrying a concealed weapon did not involve the aggressive and violent conduct that the Supreme Court noted was inherent in the crimes of burglary of a dwelling, arson, extortion, and crimes involving the use of explosives. *Id.* at 1351. The *Archer* court observed that "[b]urglary of a dwelling, arson, extortion, and the use of explosives are all aggressive, violent acts aimed at other persons or property where persons might be located and thereby injured." *Id.* In contrast, the court observed that "[c]arrying a concealed weapon, however, is a passive crime centering around possession, rather than around any overt action." *Id.*

With regard to whether the Florida crime at issue involved purposeful conduct, the *Archer* court observed that carrying a concealed weapon under Florida law did not necessarily involve purposeful conduct. *Id.* Rather, the court noted that specific intent was not an element of the crime. *Id.* This lack of specific intent made carrying a concealed weapon more similar to the DUI in *Begay*. *Id.* Finally, the court noted that its conclusion was supported by the fact that carrying a concealed weapon was not universally considered violent by other states, *id.*, and the fact that the commentary to the Sentencing Guidelines specified that a crime of violence did not include the unlawful possession of a firearm by a convicted felon. *Id.* at 1352.

In *United States v. Herrick*, No. 07-1553, 2008 WL 4603551, at *1 (1st Cir. October 17, 2008), the First Circuit addressed the question of whether a violation of Wisconsin's motor vehicle homicide statute, which required a determination that the accused was criminally negligent, constituted a crime of violence under USSG § 4B1.2. After applying the

*Begay* framework, the court concluded that Wisconsin's vehicular homicide statute was not a crime of violence under USSG § 4B1.2, even though the statute at issue required that the defendant should realize his conduct creates a substantial and unreasonable risk of death or great bodily harm to another. *Id.* at \*6. The court reasoned that, although the crime of vehicular homicide was violent, it was neither purposeful nor aggressive. *Id.*

In *United States v. Gray*, 535 F.3d 128 (2d Cir. 2008), the court addressed whether the New York crime of reckless endangerment in the first degree constituted a crime of violence under USSG § 4B1.2. *Id.* at 131-32. The court concluded that the statute, which provided that a defendant was guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, the defendant recklessly engaged in conduct which created a grave risk of death to another person, did not so constitute a crime of violence, reasoning that "[r]eckless endangerment on its face does not criminalize purposeful or deliberate conduct." *Id.* at 132.

When the violent and aggressive offense involves purposeful or deliberate conduct, the offense will be found by our sister circuits to be a violent felony or a crime of violence. For example, in *United States v. Williams*, 529 F.3d 1 (1st Cir. 2008), the court addressed whether, post-*Begay*, the crime of transporting a minor for prostitution was a crime of violence under USSG § 4B1.2. In holding that the crime at issue was a crime of violence, the court noted that the crime of transporting a minor for prostitution involves purposeful conduct where the defendant is aware of the risks that the prostituted minor will face. *Id.* at 7. The court also observed that the defendant "may well use force to ensure the minor's compliance; but it is even more likely, and fully foreseeable, that the 'clients' will endanger the minor's safety in various ways." *Id.* The court concluded that the crime of transporting a minor for prostitution fell "readily . . . within . . . the Court's trio of

adjectives," noting that it was "surpassingly difficult to see how burglary could be treated as a violent crime yet child trafficking exempted." *Id.*

In *Spells*, the defendant challenged his designation as an Armed Career Criminal under § 924(e), arguing that his prior conviction in Indiana state court for fleeing a law enforcement officer in a vehicle did not fall within § 924(e)(2)(B)(ii)'s ambit. 537 F.3d at 747. In applying *Begay*, the *Spells* court rejected the defendant's argument. *Id.* at 752-53. In so doing, the court relied on the fact that the Indiana statute at issue required the defendant to knowingly and intentionally flee from a law enforcement officer. *Id.* at 752. According to the *Spells* court, the knowledge and intent component of the Indiana statute "ensur[ed] that the law is only violated when an individual makes a 'purposeful' decision to flee from an officer." *Id.* The court further observed that intentionally fleeing from a law enforcement officer is inherently aggressive. *Id.* Finally, the *Spells* court noted that a person with a prior conviction for fleeing from a law enforcement officer in a vehicle has a greater likelihood of using a firearm if he were to possess a firearm during the commission of fleeing from a law enforcement officer in a vehicle offense. *Id.*

As these cases illustrate, in cases where the § 56-5-750(A) violation is unintentional, the violation is akin to the violations in *Archer*, *Herrick*, and *Gray*, which were found not to be crimes of violence. When the § 56-5-750(A) violation is intentional and without justification, the violation is analogous to the *Spells* failure to stop for a blue light violation, which was found by that court to be a violent felony. Because it is not clear from the record whether Roseboro's § 56-5-750(A)'s convictions involve intentional or unintentional violations, we are constrained to vacate Roseboro's sentence and remand the case to the district court for resentencing.[7]

---

[7]On appeal, Roseboro also challenges the obstruction of justice enhancement, USSG § 3C1.1, levied by the district court. We find no merit to this challenge.

## III

For the reasons stated herein, the judgment of the district court is vacated and the case is remanded for resentencing.

*VACATED AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

Following Roseboro's conviction for the illegal possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1), the district court sentenced him as an "armed career criminal" to 262 months' imprisonment. To satisfy the requirement of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), that Roseboro have three previous convictions for "violent felonies," the district court relied on Roseboro's three prior convictions — in 1996, 2001, and 2002— for failing to stop for a blue light, in violation of South Carolina Code § 56-5-750. To conclude that Roseboro's convictions were for "violent felonies," the district court relied on *United States v. James*, 337 F.3d 387, 390-91 (4th Cir. 2003) (hereinafter *James* (4th Cir.)), where we held that a violation of South Carolina Code § 56-5-750 is a violent felony for purposes of ACCA.

The majority agrees that if *James* (4th Cir.) has not been overruled, it controls and requires us to affirm the district court's sentence. The majority, however, contends that the Supreme Court's recent decision in *Begay v. United States*, 128 S. Ct. 1581 (2008), overruled *James* (4th Cir.) and that when the analysis undertaken in *Begay* is applied to South Carolina Code § 56-5-750, one must conclude that a violation of that law is not a violent felony.

Because I believe that *Begay* did not overrule our decision in *James* (4th Cir.), I respectfully dissent. *Begay* construed a New Mexico statute criminalizing driving while under the influence of alcohol, conduct materially distinguishable from

that criminalized by South Carolina Code § 56-5-750. More-over, when the analysis articulated in *Begay* is applied to the South Carolina statute, it becomes clear that a violation of the South Carolina statute is still a violent felony, as we held in *James* (4th Cir.).

I

At the outset, it is important to note that the analysis of whether a previous conviction qualifies as a violent felony for purposes of ACCA uses the categorical approach, an approach that we followed in *James* (4th Cir.) and that the Supreme Court followed in *Begay*. Under the categorical approach, we consider an offense "generically" — i.e. "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a par-ticular occasion." *Begay*, 128 S. Ct. at 1584; *see also James v. United States*, 127 S. Ct. 1586, 1596-97 (2007) (hereinafter *James* (S. Ct.); *Taylor v. United States*, 495 U.S. 575, 602 (1990). Amplifying its depreciation, and indeed rejection of using an analysis of how a statute is violated "on a particular occasion" to define the offense, the *Begay* Court applied the holding in *James* (S. Ct.) that an offense can be a "violent fel-ony even if, on *some* occasions, it can be committed in a way that poses no serious risk of physical harm." *Begay*, 128 S. Ct. at 1584 (citing *James*, 127 S. Ct. at 1597). The *James* (S. Ct.) Court, in holding that attempted burglary is categorically a violent felony and poses a serious risk of physical injury to others as required by ACCA, explained that although "[o]ne could, of course, imagine a situation in which attempted bur-glary might not pose a realistic risk of confrontation or injury to anyone[,] . . . ACCA does not require metaphysical cer-tainty." *James*, 127 S. Ct. at 1597. The Court rejected the defendant's assertion that in order to apply the categorical approach employed in *Taylor*, offense conduct in *all* cases had to present a risk of physical injury to others. The Court explained:

> We do not view [the categorical] approach as requiring that every conceivable factual offense covered by a statute must necessarily present a serious potential risk of injury before the offense can be deemed a violent felony. . . . Rather, the proper inquiry is whether the conduct encompassed by the elements of the offense, *in the ordinary case*, presents a serious potential risk of injury to another. One can always hypothesize unusual cases in which even a prototypically violent crime might not present a genuine risk of injury . . . .

*James*, 127 S. Ct. at 1597 (emphasis added and internal citation omitted).

The categorical approach thus considers a crime as defined by the language of the governing statute and projects it to the heartland of factual circumstances criminalized by the statute — the conduct that violates the elements of the statute in the ordinary case.

## II

I now turn to the question of whether *Begay* overruled our decision in *James* (4th Cir.). The Supreme Court held in *Begay* that convictions under New Mexico's driving under the influence of alcohol statute (DUI statute) are not violent felonies for purposes of ACCA. *See* 128 S. Ct. at 1588. The *Begay* Court reached this conclusion because violations of that statute typically do not involve "purposeful, violent, and aggressive conduct," as is required by ACCA. *Id.* at 1586-87.

The relevant provision of the ACCA defines a violent felony as any crime punishable by imprisonment for a term exceeding one year that

> is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that pres-

ents a serious potential risk of physical injury to another[.]

18 U.S.C. § 924(e)(2)(B)(ii). The *Begay* Court reasoned that because this definition of a violent felony includes illustrations of the kinds of crimes that fall within the definition, the general catchall provision "otherwise involves conduct that presents a serious potential risk of physical injury to another" is limited by the nature of the crimes given as illustrations: "[T]he statute covers only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'" *Begay*, 128 S. Ct. at 1585 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). Summarizing the effect of this construction, the Court observed that the illustrative crimes in the statutory definition, which limit all predicate crimes falling within the definition, "typically involve purposeful, violent, and aggressive conduct." *Id.* at 1586 (internal quotation marks and citations omitted).

When the Court considered the New Mexico statute in light of this interpretation of a "violent felony," it concluded that "unlike the example crimes [in ACCA], the conduct for which the drunk driver is convicted (driving under the influence) need not be purposeful or deliberate." *Begay*, 128 S. Ct. at 1587. Indeed, the Court observed that New Mexico's statute was comparable to statutes imposing strict liability "in respect to which the offender need not have had any criminal intent at all." *Id.* at 1586-87.

The South Carolina statute, which we considered in *James* (4th Cir.) and which criminalizes the failure to stop for a blue light, is materially different from New Mexico's DUI statute. Moreover, under the *Begay* analysis, it is indeed a violent felony for purposes of ACCA, as we held in *James* (4th Cir.). South Carolina's failure to stop for a blue light statute provides:

In the absence of mitigating circumstances, it is unlawful for a motor vehicle driver, while driving on

a road, street, or highway of the State, *to fail to stop when signaled* by a law enforcement vehicle by means of a siren or flashing light.

S.C. Code Ann. § 56-5-750(A) (emphasis added). The operative clause, "to fail to stop when signaled," requires a deliberate disobedience of the signal. "To signal" means "to *notify* by a signal" or "to *communicate*," and "a signal" is the communication of a message — "something (as a sound, gesture, or object) *that conveys notice* or warning." *Merriam-Webster's Collegiate Dictionary* 1159 (11th ed. 2007) (emphasis added). As elements of the offense, therefore, (1) a blue light signal must convey notice to a driver and (2) the driver must disobey the signal by failing to stop. *See, e.g., State v. Hoffman*, 186 S.E.2d 421, 425 (S.C. 1972). Recognizing this plain meaning of the statutory language, we held in *James* (4th Cir.) that violation of this statute involves a *deliberate* choice to disobey:

> Most cases of failing to stop for a blue light involve the *deliberate choice* by the driver *to disobey* the police officer's signal. This *disobedience* poses the threat of a direct confrontation between the police officer and the occupants of the vehicle, which, in turn, creates a potential for serious physical injury to the officer, other occupants of the vehicle, and even bystanders.

*James*, 337 F.3d at 391 (emphasis added). Our holding in *James* (4th Cir.) was a rational interpretation of South Carolina's statute, and we, as a panel of the court, are not now free to overrule it. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 n.2 (4th Cir. 2002). More importantly, this specific interpretation of the South Carolina statute was not overruled by *Begay*.

When we apply the *Begay* analysis to the South Carolina statute as construed in *James* (4th Cir.), we must conclude

that a violation of the South Carolina statute is a violent fel-ony, as defined by the ACCA.

Under *Begay*, a predicate crime must involve conduct pre-senting "a serious potential risk of physical injury to another" in a manner that is "roughly similar, in kind as well as in degree," to the risks posed by the examples given. *Begay*, 128 S. Ct. at 1585. And the examples given typically involve pur-poseful, violent, and aggressive conduct. *Id.* at 1586. Thus, the Court in *Begay* held that a violation of New Mexico's DUI statute is not a violent felony because it is not, in the ordinary case, violated with criminal intent. *Id.* at 1586-87. But the South Carolina statute is materially distinguishable because it is generally violated by the *deliberate choice* by the driver *to disobey* the police officer's signal. Although circum-stances such as those suggested by the majority can be con-ceived in which the statute is not violated deliberately, "in the ordinary case," a driver is signaled to stop and fails to do so, revealing a deliberateness. South Carolina's statute is unlike New Mexico's DUI statute, which, the Supreme Court con-cluded, did not require criminal intent.

Also important in *Begay* was the observation that when a defendant has prior convictions that are for violent felonies as defined in ACCA, there is an increased likelihood that the defendant will later pull the trigger of a gun involved in the violation of 18 U.S.C. § 922(g) (the statute for which the sen-tence is enhanced under ACCA). As the *Begay* Court noted:

> Crimes committed in such a purposeful, violent, and aggressive manner are potentially more dangerous when firearms are involved. And such crimes are characteristic of the armed career criminal, the epo-nym of the statute.

*Begay*, 128 S. Ct. at 1586 (internal quotation marks and cita-tion omitted). The Court thus concluded that a violation of the New Mexico DUI statute, which is, in the ordinary case, vio-

lated without criminal intent, is not indicative of whether the violator would be more likely to pull the trigger of a gun. *Id.* at 1587. But a violator of the South Carolina failure to stop for a blue light statute will be confronting police in virtually every instance, drastically increasing the risks associated with the crime. Surely, a driver who has three times disobeyed a police signal to stop, thereby flouting police authority, is more likely to pull the trigger of a gun when confronted by police. *Cf. James*, 127 S. Ct. at 1594-95 (concluding that a burglar, who might be confronted by police or a passerby, presents a "risk of violent confrontation" that satisfies the ACCA's requirements and noting that "[t]he main risk of burglary [a listed crime under ACCA] arises not from the simple physical act of wrongfully entering onto another's property, but rather from the possibility of a face-to-face confrontation between the burglar and a third party"); *see also United States v. Spells*, 537 F.3d 743 (7th Cir. 2008). In *Spells*, the Seventh Circuit advanced an analysis that is equally persuasive here:

> Taking flight calls the officer to give chase, and aside from any accompanying risk to pedestrians and other motorists, such flight dares the officer to needlessly endanger himself in pursuit. . . . According to statistics published by the Department of Justice, one out of every four state and federal inmates convicted for brandishing or displaying a firearm, had used the gun in this manner in an effort to get away. An individual's purposeful decision to flee an officer in a vehicle when told to stop, reflects that if that same individual were in possession of a firearm and asked to stop by police, they would have a greater propensity to use that firearm in an effort to evade arrest. This link between using a vehicle to flee an officer, and that same individual's likelihood of using a gun when fleeing in the future, distinguishes this crime from those listed by the Court in *Begay* as being dangerous, but not reflective of someone whom one normally labels [an] armed career criminal.

*Spells*, 537 F.3d at 752-53 (internal quotation marks and citations omitted).

### III

In short, the nature of the conduct criminalized by South Carolina's failure to stop for a blue light statute and our holding in *James* (4th Cir.) that a violation of that statute involves "the deliberate choice by the driver to disobey the police officer's signal" categorically present the profile of a violent felony, as demonstrated by the *Begay* analysis. The district court was undoubtedly correct in counting Roseboro's three previous convictions for violating the statute as predicate offenses for purposes of ACCA.

Accordingly, I would affirm.