[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 19, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12636

_____

D. C. Docket No. 07-00127-CR-3-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VICTOR EDGAR HARRISON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(February 19, 2009)

Before HULL, WILSON and HILL, Circuit Judges.

HULL, Circuit Judge:

This appeal presents the question of whether a prior state conviction for

violating subsection 2 of Florida's willful fleeing statute, Fla. Stat. § 316.1935(2),

is a "violent felony" under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e).

## I. BACKGROUND

In federal district court, Appellant Harrison was indicted on one count of possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1) ("Count 1"), and one count of possession of an unregistered, short-barrel shotgun, 26 U.S.C. § 5861(d) ("Count 2"). Harrison pled guilty to both counts.

The government sought a penalty increase under 18 U.S.C. § 924(e)(1). Section 924(e)(1) imposes a mandatory minimum sentence of fifteen years and a maximum of life imprisonment if a defendant, convicted of violating § 922(g), has three previous convictions that are either violent felonies or serious drug offenses.[1] Count 1 of the indictment listed Harrison's three prior Florida state court felony convictions.

The Presentence Investigation Report ("PSI") calculated Harrison's base offense level as 22, pursuant to U.S.S.G. § 2K2.1(a)(3), and recommended a two-level enhancement, pursuant to U.S.S.G. § 2K2.1(b)(1)(A), because Harrison's offense involved three or more firearms. After a three-level reduction for

---

[1]Although the ACCA does not contain an express maximum sentence, this Court has held that the "maximum sentence authorized under § 924(e) is life imprisonment." United States v. Brame, 997 F.2d 1426, 1428 (11th Cir. 1993).

2

acceptance of responsibility, the PSI recommended a total offense level of 21 and a criminal history category of VI. That yielded an advisory guidelines range of 77 to 96 months in prison. The PSI noted that for each count, the statutory maximum sentence was ten years in prison.

But the PSI failed to apply the ACCA's increased penalties for Harrison's three prior convictions. The government filed a sentencing memorandum objecting. The memorandum identified the following three convictions, listed in the PSI, as relevant: (1) a 2003 conviction under Fla. Stat. § 316.1935(3) for fleeing or attempting to elude police at high speed; (2) a 2003 conviction for possession of a controlled substance with intent to sell, manufacture or deliver; and (3) a 2000 conviction under Fla. Stat. § 316.1935(2) for fleeing or attempting to elude police. The government attached copies of the judgments and sentences for all three convictions including the information, written plea agreement, and arrest report for the 2000 conviction under § 316.1935(2).[2]

Harrison's response admitted that his two 2003 convictions qualified as violent felonies. But he argued that his 2000 conviction under § 316.1935(2) did

_____

[2]The indictment for the § 316.1935(2) conviction in 2000 stated that on December 9, 1999, Harrison "did unlawfully and willfully flee or attempt to elude a law enforcement officer in an authorized law enforcement patrol vehicle with agency insignia and other jurisdictional markings prominently displayed on the vehicle with siren and lights activated, in violation of Section 316.1935(2), Florida Statutes." Because Harrison committed the offense in 1999, we quote the 1999 version of the Florida Statute in footnote 16 infra.

not. Therefore, in his view, the district court was prohibited from looking beyond the statutory language of § 316.1935(2) to determine whether it was a conviction for a violent felony.

The probation officer then revised an addendum to the PSI. The revised addendum noted that whether a § 316.1935(2) conviction qualified as a "violent felony" for purposes of the ACCA was an issue of first impression and stated that, should the district court sustain the government's objection, Harrison's offense level would be 30 after application of the "Armed Career Criminal" provision, U.S.S.G. § 4B1.4(b)(3)(B), in the Sentencing Guidelines.[3] As to Count 1, Harrison would face a mandatory minimum fifteen-year sentence under the ACCA, whereas for Count 2 the statutory maximum would remain a ten-year sentence. Therefore, Harrison's advisory guidelines range would increase from 77 to 96 months to 180 to 210 months in prison as to Count 1, and from 77 to 96 months to 120 months in prison as to Count 2.[4]

The district court sustained the government's ACCA objection and

---

[3] Section 4B1.4(b)(3)(B) provides for an offense level of 33, but Harrison's three-level reduction for acceptance of responsibility reduced his offense level to 30.

[4] The PSI's revised addendum calculated an advisory guidelines range of 168 to 210 months based on an offense level of 30 and a criminal history category of VI. However, the probation officer's attached alternate sentencing recommendation correctly advised the district court that the low end of the range for Count 1 became 180 months due to the ACCA's mandatory minimum fifteen-year sentence. See U.S.S.G. § 5G1.1(c). For Count 2, the statutory maximum of ten years resulted in a 120-month recommended sentence. See id. § 5G1.1(a).

concluded that Harrison's § 316.1935(2) conviction qualified under the ACCA. The court adopted the PSI's revised addendum's alternate calculation of Harrison's total offense level of 30 (which applied U.S.S.G. § 4B1.4's armed career criminal offense enhancement). That yielded an advisory guidelines range of 180 to 210 months in prison as to Count 1 and 120 months in prison as to Count 2. After considering the 18 U.S.C. § 3553(a) factors, the district court sentenced Harrison to 210 months in prison and 5 years of supervised release on Count 1, and 120 months in prison and 3 years of supervised release on Count 2, to run concurrently. In imposing the sentences, the district court emphasized Harrison's criminal history and the need to protect the public from Harrison.

On appeal, Harrison raises a single issue: whether the district court erred in concluding that a conviction under Fla. Stat. § 316.1935(2) is a "violent felony" for purposes of the ACCA.[5]

## II. DISCUSSION

### A. "Violent Felony" Under the ACCA

Harrison's conviction–of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1)–would ordinarily subject to him to a term of imprisonment not

---

[5]We review de novo the district court's determination that a particular conviction qualifies as a violent felony under the ACCA. United States v. Matthews, 466 F.3d 1271, 1273 (11th Cir. 2006).

to exceed ten years. 18 U.S.C. § 924(a)(2). But where a felon violates § 922(g)(1) "and has three previous convictions . . . for a violent felony . . . such person shall be . . . imprisoned not less than fifteen years." Id. Therefore, the question of what constitutes a violent felony can make all the difference. See also Begay v. United States, – U.S. –, 128 S. Ct. 1581, 1583 (2008) ("[The ACCA] imposes a more stringent 15-year mandatory minimum sentence on [such] an offender who has three prior convictions 'for a violent felony or a serious drug offense.'" (quoting 18 U.S.C. § 924(e)(1))).

Section 924(e)(2)(B) of the ACCA defines a "violent felony" as:

any crime punishable by imprisonment for a term exceeding one year . . . that–
    (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
    (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .

18 U.S.C. § 924(e)(2)(B) (emphasis added).[6]

The parties agree that Harrison's conviction does not involve the "use, attempted use, or threatened use of physical force against the person of another."

_____

[6]The Sentencing Guidelines contain an Armed Career Criminal enhancement under which a defendant who is subject to the ACCA's increased penalties is given an increased base offense level. See U.S.S.G. § 4B1.4(b). On appeal, Harrison challenges the district court's application of the ACCA, but not the district court's subsequent application of § 4B1.4(b)(3)(B) in calculating his advisory guidelines range.

See 18 U.S.C. § 924(e)(2)(B)(i).  And the government does not contend that Harrison committed burglary, arson, extortion, or a crime that "involves the use of explosives."  See id. § 924(e)(2)(B)(ii).  Therefore, the issue on appeal is whether Harrison's conviction of violating Florida's statute making it a felony to willfully flee or attempt to elude a police officer, see Fla. Stat. § 316.1935(2), is a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B)(ii).  In the parlance of the Supreme Court's ACCA jurisprudence, the question is whether Harrison was convicted of a state crime that falls under the ACCA's "residual" clause.

In the last two years, the Supreme Court has, on three separate occasions, instructed lower courts on how to read the residual clause.  See Chambers v. United States, 555 U.S. –, 129 S. Ct. 687, 691-93 (2009); Begay,128 S. Ct. at 1586-88 (2008); James v. United States, 550 U.S. 192, 127 S. Ct. 1586, 1597 (2007).  In each case, the Supreme Court determined whether a state crime was a "violent felony" under the ACCA.  Therefore, we recount the Supreme Court's recent foray into determining whether a state crime involved "conduct that presents a serious potential risk of physical injury to another" within the meaning of the ACCA.

**B.  Categorical Approach**

7

Before assessing the riskiness of a crime under the ACCA, a court first must identify exactly what the crime at issue is. In James, the Supreme Court instructed that lower courts should employ a "categorical approach" to focus its analysis. 127 S. Ct. at 1593-94. That is, courts should "look only to the fact of conviction and the statutory definition of the prior offense." Id. at 1594 (quoting Taylor v. United States, 495 U.S. 575, 602, 110 S. Ct. 2143, 2160 (1990)). Generally speaking, courts should not consider the "particular facts disclosed by the record of conviction." Id. (quotation marks omitted). Such an approach requires looking to the "elements of the offense . . . without inquiring into the specific conduct of this particular offender." Id. (emphasis omitted).[7] Therefore, we look to the way the crime is "generally committed"–not by examining the particular facts in a defendant's case or by focusing on extreme situations. Chambers, 129 S. Ct. at 690. It is the "ordinary case" or the "generic sense" of the state crime that counts.

---

[7]Where the judgment of conviction and the statute are ambiguous and the district court cannot determine whether the prior conviction qualifies, the district court may look to the facts underlying the state conviction to determine whether it qualifies. United States v. Llanos-Agostadero, 486 F.3d 1194, 1196-97 (11th Cir. 2007) (quotation marks and citation omitted). In so doing, the district court is generally limited to "relying only on the 'charging document[s], written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented.'" Id. (quoting in part United States v. Aguilar-Ortiz, 450 F.3d 1271, 1273 (11th Cir. 2006) (concluding that Florida statute is ambiguous and looking to facts of case to determine whether prior conviction qualified for 12-level enhancement in U.S.S.G. § 2L1.2(b)(1)(A)(I) for drug trafficking offenses)); see also Shepard v. United States, 544 U.S. 13, 19-26, 125 S. Ct. 1254, 1259-63 (2005). In this case, there is no contention that § 316.1935(2) or the judgment of conviction are ambiguous. And neither party argues that we should look to the facts underlying Harrison's conviction.

Begay, 128 S. Ct. at 1584 ("In determining whether [a] crime is a violent felony, we consider the offense generically, that is to say, we examine it in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion."); James, 127 S. Ct. at 1597 ("[T]he proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another.").[8]

With respect to choosing the correct category of crime, the categorical approach changes slightly when a court analyzes a state crime under the residual clause, as is the case here, as opposed to a state crime enumerated in § 924(e)(2)(B)(ii). For example, in United States v. Taylor, where the Supreme Court first unveiled the "categorical approach," the question was whether the word "burglary"–an enumerated offense in § 924(e)(2)(b)(ii)–required a "uniform definition independent of the labels employed by the various States' criminal codes." 495 U.S. at 592, 110 S. Ct. at 2155. The Supreme Court answered that question affirmatively and defined "burglary," as used in the ACCA itself, as "any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with

---

[8]But the Supreme Court has warned that "[t]his categorical approach requires courts to choose the right category. And sometimes the choice is not obvious." Chambers, 129 S. Ct. at 690.

9

intent to commit a crime." Id. at 599, 110 S. Ct. at 2158. In the Supreme Court's view, Congress used the word "burglary" in "the generic sense in which the term is now used in the criminal codes of most States." Id. at 598, 110 S. Ct. at 2158 (citations omitted). The uniformity concerns in Taylor turned only on ensuring a consistent definition of a word that Congress selected. Id. at 590, 110 S. Ct. at 2154 ("It seems to us implausible that Congress intended the meaning of 'burglary' for purposes of § 924(e) to depend on the definition adopted by the State of conviction.").

But when the Supreme Court has determined whether a state crime not enumerated in § 924(e) satisfies the residual clause, it has explicitly looked to the particular state statute to supply the elements of the relevant crime. See Chambers, 129 S. Ct. at 691 (breaking down Illinois statute into seven separate elements for the purpose of identifying the relevant conduct); Begay, 128 S. Ct. at 1584 (quoting New Mexico's DUI statute for the purpose of identifying the relevant crime); James, 127 S. Ct. at 1591 ("The question before the Court, then, is whether attempted burglary, as defined by Florida law, falls within the ACCA's residual provision."). In other words, in residual clause cases, such as this, we pay attention to the way that the state statutory scheme identifies the relevant crime. Although

10

we look at the state crime as it is "ordinarily committed," we focus on the elements of the state crime to determine the way in which it is ordinarily committed.

### C. Begay: Similar in Kind, as Well as Risk

Initially, the Supreme Court assessed only the degree of risk posed by the crime to determine whether it was a violent felony. For example, in James, the Supreme Court addressed only whether an attempted burglary, as defined by Florida law, posed the same "serious potential risk of physical injury" that a completed burglary did. James, 127 S. Ct. at 1594 ("In this case, we can ask whether the risk posed by attempted burglary is comparable to that posed by its closest analog among the enumerated offenses–here, completed burglary."); id. at 1597 ("As long as an offense is of a type that, by its nature, presents a serious potential risk of injury to another, it satisfies the requirements of § 924(e)(2)(B)(ii)'s residual provision."); Begay, 128 S. Ct. at 1585 ("Our recent case, James v. United States–where we considered only matters of degree, i.e., whether the amount of risk posed by attempted burglary was comparable to the amount of risk posed by the example of burglary–illustrates the difficulty of interpreting the examples in this respect."). But Begay, decided in 2008, added a new requirement to the violent felony inquiry.

11

Begay presented the issue of whether New Mexico's Driving Under the Influence ("DUI") crime, which was not an enumerated offense, was a violent felony. 128 S. Ct. at 1584.[9] The Supreme Court in Begay "assume[d] that the lower courts were right in concluding that DUI involves conduct that 'presents a serious potential risk of physical injury to another.'" Id. (quoting § 924(e)(2)(B)(ii)).

Despite the serious potential risk of injury, which would have been enough to qualify under James,[10] the Supreme Court in Begay added the requirement that,

---

[9]The Supreme Court described New Mexico's DUI statute as follows:
New Mexico's DUI statute makes it a crime (and a felony after three earlier convictions) to 'drive a vehicle within [the] state' if the driver 'is under the influence of intoxicating liquor' (or has an alcohol concentration of .08 or more in his blood or breath within three hours of having driven the vehicle resulting from 'alcohol consumed before or while driving the vehicle'). [N.M. Stat.] §§ 66-8-102(A), (C).
Begay, 128 S. Ct. at 1584.

[10]In Begay, Justice Scalia concurred on the ground that DUIs do not pose a "serious potential risk of physical injury to another" as compared to burglary. 128 S. Ct. at 1588 (Scalia, J., concurring). In Justice Scalia's view, the majority's statistical evidence only proved that "[d]runk driving is surely a national problem of great concern." Id. at 1591. But he questioned the majority's reliance on that evidence:
[T]he fact that it kills many people each year tells us very little about whether a single act of drunk driving "involves conduct that presents a serious potential risk of physical injury to another." It may well be that an even greater number of deaths occurs annually to pedestrians crossing the street; but that hardly means that crossing the street presents a serious potential risk of injury. Where the issue is "risk," the annual number of injuries from an activity must be compared with the annual incidents of the activity. Otherwise drunk driving could be said to pose a more serious risk of physical harm than murder. In addition, drunk driving is a combination of two activities: (1) drinking and (2) driving. If driving alone results

---

12

to qualify as a "violent felony," the crime must be "roughly similar, in kind as well

as in degree of risk posed." Id. at 1585. Simply put, "the provision's listed

examples–burglary, arson, extortion, or crimes involving the use of

explosives–illustrate the kinds of crimes that fall within the statute's scope." Id. at

1584-85. "Their presence indicates that the statute covers only similar crimes,

rather than every crime that 'presents a serious potential risk of physical injury to

another.'" Id. at 1585 (quoting § 924(e)(2)(B)(ii)). And, to the Supreme Court,

none of the enumerated offenses in § 924(e)(2)(B)(ii) looked quite like DUI.

Although the Supreme Court admitted that DUI is "extremely dangerous"

and poses a "serious potential risk of injury," it explained that, in its view, DUI

still "differs from the example crimes . . . in at least one pertinent, and important,

respect." Id. at 1586. "The listed crimes all typically involve purposeful, violent,

and aggressive conduct." Id. (quotation marks and citation omitted). In

elaborating on its distinction, the Supreme Court reasoned that "purposeful,

violent, and aggressive conduct" is the type that "makes [it] more likely that an

---

in injury in a certain percentage of cases, it could hardly be said that the entirety of the risk posed by drunk driving can be attributed to the combination. And finally, injuries to the drunk drivers themselves must be excluded from the calculus, because the statute counts only injuries to other persons.

Id.

13

offender, later possessing a gun, will use that gun deliberately to harm a victim."

Id. "Crimes committed in such a purposeful, violent, and aggressive manner are potentially more dangerous when firearms are involved." Id. (quotation marks and citation omitted). "And such crimes are characteristics of the armed career criminal, the eponym of the statute." Id.[11]

In contrast, the Supreme Court concluded that DUIs are not "purposeful, violent, and aggressive." Id. They are strict liability crimes with no intent requirement. Id. at 1586-87. Therefore, such crimes are not "purposeful or deliberate." Id. at 1587. The Supreme Court added that "[t]he distinction we make does not minimize the seriousness of the risks attached to driving under the influence," but rather, "for purposes of the particular statutory provision before us, a prior record of DUI, a strict liability crime, differs from a prior record of violent and aggressive crimes committed intentionally, such as arson, burglary, extortion,

---

[11]The Supreme Court elaborated:

In this respect–namely, a prior crime's relevance to the possibility of future danger with a gun–crimes involving intentional or purposeful conduct (as in burglary and arson) are different than DUI, a strict liability crime. In both instances, the offender's prior crimes reveal a degree of callousness toward risk, but in the former instance they also show an increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger. We have no reason to believe that Congress intended a 15-year mandatory prison term where that increased likelihood does not exist.

Begay, 128 S. Ct. at 1587.

or crimes involving the use of explosives." Id. at 1588. A prior DUI conviction does not "show an increased likelihood that the offender is the kind of person who might deliberately point [a] gun and pull the trigger." Id. at 1587. "We have no reason to believe that Congress intended a 15-year mandatory prison term where that increased likelihood does not exist." Id. A DUI "is simply too unlike the provision's listed examples for us to believe that Congress intended the provision to cover it." Id. at 1584. Therefore, the Supreme Court concluded that felony DUI does not qualify as a "violent felony" under the ACCA. Id.

James and Begay, taken together, establish a three-step inquiry for determining whether a crime falls under the ACCA's residual clause. First, what is the relevant category of crime, determined by looking to how the crime is ordinarily committed? Second, does that crime pose a "serious potential risk of physical injury" that is similar in degree to the risks posed by the enumerated crimes? Third, is that crime similar in kind to the enumerated crimes?

**D. Chambers**

Next came Chambers, where the Supreme Court offered additional insight into how to apply this three-step inquiry. Decided just one year after Begay, Chambers addressed whether Illinois's crime of knowingly failing to report to a

15

penal institution was a violent felony under the ACCA's residual clause. 129 S.

Ct. at 691.[12] The Seventh Circuit held it was a violent felony as its approach was to

equate all escape-like crimes as "violent crimes." See United States v. Chambers,

473 F.3d 724, 726 (7th Cir. 2007).[13] The Supreme Court reversed the Seventh

Circuit and held that a felon's "failure to report" crime does not fall under the

residual clause. Chambers, 129 S. Ct. at 693.

First, the Supreme Court noted that the categorical approach requires

---

[12] The Illinois statute cited in Chambers is entitled "Escape; failure to report to a penal institution or to report for periodic imprisonment" and reads as follows:

> "A person convicted of a felony, adjudicated a delinquent minor for the commission of a felony offense under the Juvenile Court Act of 1987, who intentionally escapes from any penal institution or from the custody of an employee of that institution commits a Class 2 felony; however, a person convicted of a felony or adjudicated a delinquent minor for the commission of a felony offense under the Juvenile Court Act of 1987, who knowingly fails to report to a penal institution or to report for periodic imprisonment at any time or knowingly fails to return from furlough or from work and day release or who knowingly fails to abide by the terms of home confinement is guilty of a Class 3 felony."

Chambers, 129 S. Ct. at 693 app. A (quoting 720 Ill. Comp. Stat. 5/31–6(a) (West Supp. 2008)) (emphasis added). Although Chambers was convicted in 1998, the Supreme Court quoted the 2008 version of the Illinois statute. We do the same.

[13] Even though it concluded that a failure to report was a violent felony, the Seventh Circuit expressed discomfort at making such a determination in the absence of statistical evidence. Chambers, 473 F.3d at 727 ("The Sentencing Commission, or if it is unwilling a criminal justice institute or scholar, would do a great service to federal penology by conducting a study comparing the frequency of violence in escapes from custody to the frequency of violence in failures to report or return."); id. ("It is apparent that more research will be needed to establish whether failures to report or return have properly been categorized by this and most other courts as crimes of violence."); id. at 726 ("[I]t is an embarrassment to the law when judges base decisions of consequence on conjectures . . . .").

16

"classification of the crime," a consideration of the "generic crime," and an assessment of the "crime as generally committed." Id. at 690. Although the failure-to-report-to-a-penal-institution offense was contained in the same subsection of the Illinois statute as an escape from a penal institution, the Supreme Court recognized that the behavior underlying the crime of knowingly failing to report to a penal institution "would seem less likely to involve a risk of physical harm than the less passive, more aggressive behavior underlying an escape from custody." Id. at 691. Due to the different nature of the two types of behavior listed in the same subsection of Illinois's statute, the Supreme Court treated the subsection of the statute as containing two separate crimes–escape from custody as one offense and failure to report to a penal institution as another. Id. at 690.

Second, the Supreme Court determined that a failure to report to a penal institution "does not involve conduct that presents a serious potential risk of physical injury to another." Id. (quotation marks omitted). It noted that "[c]onceptually speaking, the crime amounts to a form of inaction, a far cry from the purposeful, violent, and aggressive conduct potentially at issue when an offender uses explosives against property, commits arson, burgles a dwelling or residence, or engages in certain forms of extortion." Id. at 692 (quotation marks

omitted). "While an offender who fails to report must of course be doing

something at the relevant time, there is no reason to believe that the something

poses a serious potential risk of physical injury." Id. "To the contrary, an

individual who fails to report would seem unlikely, not likely, to call attention to

his whereabouts by simultaneously engaging in additional violent and unlawful

conduct." Id.

Third, the Supreme Court addressed the government's contention that a

"failure to report reveals the offender's special, strong aversion to penal custody."

Id. In support, the government cited "three cases arising over a period of 30 years

in which reported opinions indicate that individuals shot at officers attempting to

recapture them." Id. The Supreme Court rejected the government's argument.

But the language that it used in doing so appears to have clarified the relevant

question for assessing the seriousness of the state crime. "The offender's aversion

to penal custody, even if special, is beside the point. The question is whether such

an offender is significantly more likely than others to attack, or physically to resist,

an apprehender, thereby producing a 'serious potential risk of physical injury.'"

Id. (quoting § 924(e)(2)(B)(ii)).

In Chambers, the Supreme Court did not rely on speculation to supply the

answer to that question. Instead, it relied on a report by the United States

Sentencing Commission, prepared exclusively for that case, that "provide[d] a

conclusive, negative answer." Id. (citing United States Sentencing Commission,

Report on Federal Escape Offenses in Fiscal Years 2006 and 2007 ("Report on

Federal Escape Offenses") 6 (Nov. 2008),

http://www.ussc.gov/general/escape_FY0607_final.pdf, which identified "every

federal case in 2006 or 2007 in which a federal sentencing court applied the

Sentencing Guideline, 'Escape, Instigating or Assisting Escape,' 1 United States

Sentencing Commission, Guidelines Manual § 2P1.1 (Nov. 2008), and in which

sufficient detail was provided . . . about the circumstances of the crime to permit

analysis").[14] The 2008 report's analysis "included calculation of the likelihood that

violence would accompany commission of the escape or the offender's later

apprehension." Id. The 2008 study "strongly support[ed] the intuitive belief that

_____

[14]The Sentencing Commission compiled the November 2008 report while Chambers was pending before the Supreme Court. According to the Supreme Court's docket sheet, the Solicitor General sought to "lodge copies of the newly issued USSC Report on Federal Escape Offenses in Fiscal Years 2006 & 2007." The Supreme Court approved the Solicitor General's request four days before oral argument. Further, the Seventh Circuit's request, in Chambers, for more statistical evidence on whether failures to report pose a serious risk of physical injury did not go unheard. See Report on Federal Escape Offenses 1 ("Prompted by a suggestion in a decision by the United States Court of Appeals for the Seventh Circuit, the United States Sentencing Commission undertook a data analysis of federal escape cases to inform the legal question of whether the crime of escape qualifies as a 'violent felony' . . . .").

failure to report does not involve a serious potential risk of physical injury." Id.[15]

### E. Statistics

Chambers's use of statistical evidence was not an aberration. A closer examination of James and Begay demonstrates that Chambers is simply the latest in a line of Supreme Court cases that have used hard data to assist in making risk assessments under the ACCA's residual clause. Although calculating risk "does not require metaphysical certainty," James, 127 S. Ct. at 1597, it appears that statistical evidence now plays a role in assessing risk for non-enumerated crimes under the residual clause, Chambers, 129 S. Ct. at 692 (majority opinion relying on a 2008 statistical report prepared exclusively for that case); id. at 695 (Alito, J., concurring) ("Today's decision, for example, turns on little more than a statistical analysis of a research report prepared by the United States Sentencing Commission.").

Likewise, in James, the Supreme Court used statistics to help determine the degree of potential risk posed by an attempted burglary versus a completed

---

[15]The 2008 Report found:
Of 414 such cases, 160 involved a failure to report either for incarceration (42) or for custody after having been temporarily released (118). Of these 160 cases, none at all involved violence–not during commission of the offense itself, not during the offender's later apprehension–although in 5 instances (3.1%) the offenders were armed.
Chambers, 129 S. Ct. at 692 (citations omitted).

burglary.  In <u>James</u>, the Supreme Court concluded that "[a]ttempted burglary poses the same kind of risk.  Interrupting an intruder at the doorstep while the would-be burglar is attempting a break-in creates a risk of violent confrontation comparable to that posed by finding him inside the structure itself."  <u>James</u>, 127 S. Ct. at 1595. But in doing so, the Supreme Court looked to the United States Sentencing Guidelines' inclusion of attempt crimes under the career-offender enhancement to support its conclusion that attempted burglaries pose the same risks as completed burglaries.  <u>Id.</u> at 1596.  It emphasized that the Sentencing Commission's "judgment was based on the Commission's review of empirical sentencing data and presumably reflects an assessment that attempt crimes often pose a similar risk of injury as completed offenses."  <u>Id.</u>  The Supreme Court then quoted approvingly a First Circuit decision noting that "'[t]he Commission, which collects detailed sentencing data on virtually every federal criminal case, is better able than any individual court to make an informed judgment about the relation between' a particular offense and 'the likelihood of accompanying violence.'"  <u>Id.</u> (quoting <u>United States v. Doe</u>, 960 F.2d 221, 225 (1st Cir. 1992) (Breyer, J.)).  Based on this statistical data, the Supreme Court concluded that attempted burglary poses a similar risk of violence as completed burglary.  <u>Id.</u>

And in <u>Begay</u>, the Supreme Court stated that "[d]runk driving is an

21

extremely dangerous crime."  128 S. Ct. at 1584.  But it backed its claim up with 2006 statistics from the National Highway Traffic Safety Administration documenting that 17,000 people die each year in alcohol-related motor vehicle incidents.  Id.  Therefore, James, Begay, and Chambers, at a minimum, demonstrate that statistical evidence plays a role in assessing the risk of non-enumerated crimes under the residual clause.

With these background principles, we now apply the Supreme Court's residual clause analysis to Harrison's conviction.

## F.  Florida's Willful Fleeing Statute

We start by examining the relevant state crime's statutory elements to identify the correct "category" of crime.  Begay, 128 S. Ct. at 1584.  That is, we look to "how the law defines the offense."  Id.  Here, Harrison pled guilty to violating Florida Statutes § 316.1935(2).  We print the relevant part of Florida's statute.[16]

---

[16]Florida Statutes § 316.1935 (1999), entitled "Fleeing or attempting to elude a law enforcement officer; aggravated fleeing and eluding," provides:
>    (1)  It is unlawful for the operator of any vehicle, having knowledge that he or she has been ordered to stop such vehicle by a duly authorized law enforcement officer, willfully to refuse or fail to stop the vehicle in compliance with such order or, having stopped in knowing compliance with such order, willfully to flee in an attempt to elude the officer, and a person who violates this subsection commits a misdemeanor . . . .
>    (2) Any person who willfully flees or attempts to elude a law enforcement officer in an authorized law enforcement patrol vehicle, with agency insignia and other

22

Although a number of states treat the crime of fleeing or eluding a police officer as one crime, Florida does not. Rather, Florida's statutory scheme differentiates between different types of fleeing behavior. See Fla. Stat. § 316.1935(1)-(3). Florida's statute distinguishes between willful failures to stop a vehicle or willful fleeing after being ordered to stop by an officer, § 316.1935(1), willful fleeing after a police vehicle has activated its lights and sirens, § 316.1935(2) (the provision at issue here), and such willful fleeing (after a police vehicle has activated its lights and sirens) with "high speed" or "wanton disregard for the safety of persons or property," § 316.1935(3).[17] The statute also classifies each type of conduct into a misdemeanor and various felony classes based on the degree of seriousness of the behavior. Compare Fla. Stat. § 316.1935(1)

---

jurisdictional markings prominently displayed on the vehicle, with siren and lights activated commits a felony of the third degree . . . .
(3) Any person who willfully flees or attempts to elude a law enforcement officer in an authorized law enforcement patrol vehicle with agency insignia and other jurisdictional markings prominently displayed on the vehicle with siren and lights activated, and during the course of the fleeing or attempted eluding drives at high speed, or in any manner which demonstrates a wanton disregard for the safety of persons or property commits a felony of the second degree . . . .

Fla. Stat. § 316.1935 (emphasis added).

[17]Subsection 2 does not explicitly require that the offender be operating a motor vehicle. But subsection 1 applies to the "operator of any vehicle." And subsections 2 and 3 then add elements and increase the penalties for different types of behavior involving the refusal to stop a vehicle. Further, the entire statute is housed in the "Motor Vehicles" title of Florida Statutes. Thus, it appears that subsection 2 requires, or at least contemplates, that the offender be operating a motor vehicle. At oral argument, both parties assumed that the crime in § 316.1935(2) is "ordinarily committed" by a person operating a motor vehicle.

23

(misdemeanor), <u>with</u> Fla. Stat. § 316.1935(2) (third-degree felony), <u>and</u> Fla. Stat. § 316.1935(3) (second-degree felony).[18] The Florida legislature's differentiation between types of fleeing is relevant under the categorical approach. <u>See</u> <u>Chambers</u>, 129 S. Ct. at 690-91 (relying on "different degrees of seriousness" of the penalty as a basis for distinguishing the relevant category of crime and for differentiating between escape from a penal institution and failure to report to a penal institution).

And this is not the first time that we have addressed this Florida statute. <u>See</u> <u>United States v. Orisnord</u>, 483 F.3d 1169, 1182-83 (11th Cir. 2007). In <u>Orisnord</u>, we examined whether a § 316.1935(3) violation is a "crime of violence" under U.S.S.G. § 4B1.2(a)(2).[19] <u>Id.</u> at 1182-83. The language of U.S.S.G. § 4B1.2(a)(2)

---

[18]Although Florida subsequently modified its willfully fleeing and eluding statute, <u>see</u> Fla. Stat. § 316.1935 (2004), none of those modifications impacted subsection 2.

As to subsections 1 and 3, the 2004 modifications made a violation of § 316.1935(1) a third-degree felony, not a misdemeanor, and a violation of § 316.1935(3) either a second-degree felony or a first-degree felony, depending on whether the offender "causes serious bodily injury or death to another person." <u>See</u> Fla. Stat. § 316.1935(1)-(3) (2004). A violation of § 316.1935(2) remains a third-degree felony. <u>Id.</u>

[19]Section 4B1.2(a)(2) of the Sentencing Guidelines provides that a "crime of violence" is a federal or state offense that carries a sentence of more than one year's imprisonment and, among other things, "involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a)(2). Under § 4B1.1(a), a defendant is a "career offender" if (1) he was at least 18 years old at the time of the offense; (2) the instant offense is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions for either a crime of violence or a controlled substance offense. U.S.S.G. § 4B1.1(a).

is identical to the ACCA's residual clause in all material respects.[20] Both define a violent crime as one "that presents a serious potential risk of physical injury to another." The question in Orisnord was whether a violation of Fla. Stat. § 316.1935(3)–which makes it illegal to willfully flee from an officer "at high speed, or in any manner which demonstrates a wanton disregard for the safety of persons or property"–presented a "serious potential risk" of injury. Id. at 1182-83.

Orisnord answered that question affirmatively. But it did so by focusing solely on the potential risk of injury posed by willfully fleeing an officer in a motor vehicle. Id. The Orisnord Court noted that "the stress and urgency of the situation will likely cause the person fleeing to drive recklessly, turning any pursuit into a

---

[20]See United States v. Archer, 531 F.3d 1347, 1350 n.1 (11th Cir. 2008) (noting that the definition of a "crime of violence" in U.S.S.G. § 4B1.2(a)(2) virtually mirrors the definition of "violent felony" in 18 U.S.C. § 924(e)(2)(B)(ii)). In Archer, we reconsidered, in light of Begay, our prior precedent in United States v. Gilbert, 138 F.3d 1371, 1372 (11th Cir. 1998), which held that the Florida offense of carrying a concealed weapon was a crime of violence under § 4B1.1(a). The Archer Court assumed that, post-Begay, carrying a concealed weapon still presents a serious potential risk of injury but concluded it does not satisfy Begay's requirement that the crime also be "similar, in kind as well as in degree of risk posed" to the crimes enumerated in § 4B1.2(a)(2), such as burglary of a dwelling, arson, extortion, and crimes involving the use of explosives. Archer, 531 F.3d at 1351-52.

The Archer Court reasoned that "[c]arrying a concealed weapon does not involve the aggressive, violent conduct that the Supreme Court noted is inherent in the enumerated crimes." Id. at 1351. We also said "[w]e do not wish to minimize the danger that possession may quickly transform into use, especially when the firearm is 'readily accessible,'" but "[t]he act of possession does not, without more, however, involve any aggressive or violent behavior." Id. And we concluded that the "specific intent of the defendant to conceal the weapon is not an element of the crime" and thus carrying a concealed weapon does not necessarily involve purposeful conduct. Id.

25

high-speed chase with the potential for serious harm to pedestrians, other drivers, and the pursuing officers." Id. at 1182.

But the Orisnord Court wrote without the benefit of the Supreme Court's decisions in James, Begay, and Chambers. As explained above, Begay added a third step to the residual-clause analysis: whether the crime–even if it poses a serious potential risk of injury–is similar in kind to the enumerated offenses in § 924(e)(2)(B)(ii). See Begay, 128 S. Ct. at 1585 (stating the residual clause does not cover "every crime that presents a serious potential risk of physical injury to another" (quotation marks omitted)). Orisnord did not address this third step.

Orisnord also compared willful fleeing to escape crimes and noted that prior precedent held that even walking away from a non-secure facility was a "crime of violence" under the Sentencing Guidelines. 483 F.3d at 1183.[21] But Chambers

---

[21]Specifically, Orisnord pointed out that "by deliberately disobeying a law enforcement officer, the fleeing motorist provokes an inevitable, escalated confrontation," "[s]uch a confrontation inherently presents the serious potential risk of physical injury" and "[i]n this regard, fleeing and eluding resembles the offense of escape–which . . . constitutes a 'crime of violence' under the Guidelines, even where the escape involves merely walking away from a non-secure facility." 483 F.3d 1169, 1183 (citing, among other cases, the escape case of United States v. Gay, 251 F.3d 950, 955 (11th Cir. 2001)).

Based on Gay, this Court subsequently held that a conviction under Florida's escape statute—including a failure to return to a halfway house—is a violent felony under § 924(e)(2)(B) of the ACCA. United States v. Taylor, 489 F.3d 1112, 1113-14 (11th Cir. 2007). The Supreme Court has vacated Taylor for reconsideration in light of Chambers. See United States v. Taylor, – U.S. –, 129 S. Ct. 990 (2009). Today, we decide the residual clause issue only as to the willful fleeing violation in § 316.1935(2) and mention the escape cases only because Orisnord relied on them in part.

recognized that certain escape crimes—such as the willful failure of felons to report to their penal institutions—are not violent felonies. Chambers, 129 S. Ct. at 689. In any event, Orisnord involved only the separate and more serious crime in subsection 3 of § 316.1935–not subsection 2; Orisnord is helpful but not controlling.

With James, Begay, Chambers, and Orisnord as guideposts, we turn to the question of whether a § 316.1935(2) offense presents a "serious potential risk of physical injury." When assessing risk, we examine the crime as "generally committed," see Chambers, 129 S. Ct. at 690, and settle on the appropriate crime by looking to the "elements of the offense" under Florida law, James, 127 S. Ct. at 1594. And as the categorical approach requires, we do not consider how an individual offender, in this case Harrison, committed the offense "on a particular occasion." Begay, 128 S. Ct. at 1584. But we do examine "[t]he nature of the behavior that likely underlies [the] statutory phrase" in question. Chambers, 129 S. Ct. at 690.

A person violates § 316.1935(2) and commits a third-degree felony under Florida law where she "willfully flees or attempts to elude a law enforcement officer in an authorized law enforcement patrol vehicle . . . with siren and lights

activated." Fla. Stat. § 316.1935(2); <u>Arroyo v. State</u>, 901 So. 2d 1014, 1015 (Fla.

Dist. Ct. App. 2005); <u>Sanford v. State</u>, 872 So. 2d 406, 407-08 (Fla. Dist. Ct. App.

2004).

Florida's statutory elements drive our assessment of the "ordinary case" of

the statutory violation in § 316.1935(2). The behavior ordinarily underlying the

crime in § 316.1935(2) involves only this conduct: (1) a law enforcement vehicle,

with its siren and lights activated, signals the motorist to stop and (2) the motorist

willfully refuses or fails to stop the vehicle.[22] Our "categorization" of the crime

here, as it is ordinarily committed, reflects the Florida legislature's decision to

differentiate between very different types of fleeing behavior. The Florida

legislature has not included either high speed or wanton disregard for persons or

---

[22]Under Florida law, a willful refusal or failure to stop can form the basis for a conviction under subsection 2. <u>See</u> <u>Sanford</u>, 872 So. 2d at 407-08 (affirming jury instructions that the State must prove the four elements of a subsection 2 crime, including that the offender "willfully refused or failed to stop the vehicle in compliance with the order"); <u>Anderson v. State</u>, 780 So. 2d 1012, 1014 (Fla. Dist. Ct. App. 2001) (identifying prosecutor's charge that defendant Anderson's failure to stop "formed the basis for the crime").

Florida courts distinguish subsection 2 (a felony) from subsection 1 (a misdemeanor) on the basis of whether the officer has activated her "lights and sirens." <u>Arroyo</u>, 901 So. 2d at 1015 ("The fleeing and eluding statute has three relevant subsections. Subsection (1) is a misdemeanor. It prohibits the willful refusal to stop when ordered to do so by an authorized police officer in a marked police vehicle and after 'having stopped,' willfully fleeing to elude the officer. § 316.1935(1), Fla. Stat. (2002). Subsection (2) converts the offense to a third degree felony by adding the officer's use of 'lights and sirens' as an element of the crime. § 316.1935(2), Fla. Stat. (2002). Subsection (3) converts aggravated fleeing and eluding to a second degree felony by adding the elements of 'high speed' or 'wanton disregard' as elements of the crime. § 316.1935(3), Fla. Stat. (2002).").

28

property as elements of a § 316.1935(2) crime.[23]

Having determined how a § 316.1935(2) crime is ordinarily committed, we turn to the Supreme Court's other discrete questions. First, is willfully failing to stop after a police officer signals one to do so, as proscribed by § 316.1935(2), "roughly similar" to § 924(e)(2)(B)(ii)'s enumerated offenses in "degree of risk posed"? See Begay, 128 S. Ct. at 1585. And second, is such conduct, as proscribed by § 316.193(2), "roughly similar . . . in kind" to the enumerated offenses? Id.

We recognize that the ACCA's residual clause speaks in terms of a "potential risk," that "potential risks" in the ACCA "are inherently probabilistic concepts," and that the "ACCA does not require metaphysical certainty." James, 127 S. Ct. at 1597. And we have little difficulty gauging potential risk when high speed or reckless driving is coupled with a willful failure to stop in response to a

---

[23]Our acceptance of Florida's various types of fleeing and eluding crimes is driven by our recognition of its sovereign right to define the scope of behavior that it seeks to criminalize. Federal courts, to the extent possible, should respect state efforts to make and enforce different types of criminal laws. See Danforth v. Minnestota, – U.S. –, 128 S. Ct. 1029, 1041 (2008) ("States are independent sovereigns with plenary authority to make and enforce their own laws."); Engle v. Isaac, 456 U.S. 107, 128, 102 S. Ct. 1558, 1572 (1982) ("The States possess primary authority for defining and enforcing the criminal law."). The categorical approach demands that courts look not to the conduct of a particular defendant, but to the behavior that likely underlies a statutorily defined crime. Thus, we look to the elements of the state crime–rather than some roving federal common law definition of willfully fleeing an officer, unmoored by a particular state's statutory scheme.

police signal to do so. The dangerous conduct ordinarily underlying a violation of § 316.1935(3), for example, presents a serious potential risk of injury.

But the nature of a § 316.1935(2) crime, as ordinarily committed, does not involve the same high level of risk. Neither high speed nor reckless driving is a statutory element of the Florida crime at issue here. And such elements are not ordinarily involved in a § 316.1935(2) crime. Admittedly, willfully fleeing a police officer in a motor vehicle is a confrontational act. But that disobedience does not always translate into a serious potential risk of physical injury. Indeed, the fact that the behavior underlying Florida's willful-fleeing crime, in the ordinary case, involves only a driver who willfully refuses to stop and continues driving on–but without high speed or recklessness–makes it unlikely that the confrontation will escalate into a high-speed chase that threatens pedestrians, other drivers, or the officer. That disobedience, without more, does not show that the "offender is significantly more likely than others to attack, or physically to resist, an apprehender, thereby producing a 'serious potential risk of physical injury.'" Chambers, 129 S. Ct. at 692 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). Rather, because Florida's crime in § 316.1935(2), as ordinarily committed, does not contain the elements of high speed or reckless driving, it strikes us as less likely

30

that the offender will become violent and resist arrest.

The argument that willfully eluding an officer, at any speed, is a form of escape, does not impact our analysis. Chambers rejects the notion that all escapes are created equal. And, likewise, we reject the notion that all willful fleeing crimes should be treated equally, especially where the Florida statute differentiates between types of willful fleeing.

It is also relevant to our analysis that the government bears the burden to show that a § 316.1935(2) violation poses a "serious potential risk of physical injury to another."[24] The Supreme Court has addressed the scope of the residual clause three times in the past two years, and each time, it has used statistical evidence to aid its risk assessment.[25] In some crimes, such as armed robbery, rape, and arson, the serious potential risk of physical injury is obvious. But in lesser crimes, courts, without empirical evidence, are left to rely on their own intuition about whether certain kinds of behavior pose serious potential risks of physical

---

[24]The burden of proof for establishing that a sentencing enhancement is warranted lies with the prosecution, and the district court must ensure the government carries its burden of proof. United States v. Young, 527 F.3d 1274, 1277 (11th Cir.), cert. denied, – U.S. –, 129 S. Ct. 616 (2008).

[25]Harrison's sentencing only took place on April 22, 2008, which was well before the Supreme Court decided Chambers, and three days after it decided Begay on April 16, 2008. Chambers and Begay made a healthier use of statistical evidence than past cases. Thus, it is not surprising that the government presented no empirical data at Harrison's sentencing.

injury. Although we unequivocally express no hard and fast rule requiring the use of statistical evidence in residual-clause cases, this type of case would benefit from empirical evidence of the likelihood of physical injury in statutory willful fleeing crimes that do not have the elements of high speed or reckless disregard.[26] A useful study would look at the number of physical injuries associated with such willful fleeing crimes as compared to the total number of such willful fleeing crimes.

Even assuming a serious potential risk of physical injury exists in a § 316.1935(2) violation, Begay requires courts to further address whether the crime is similar "in kind" to burglary, arson, extortion, and the use of explosives. Begay, 128 S. Ct. at 1585. For § 316.1935(2) to be "similar in kind" to those enumerated offenses, the conduct underlying the crime must be "purposeful, violent, and aggressive." Chambers, 129 S. Ct. at 692; Begay, 128 S. Ct. at 1586. To be sure, the Supreme Court did not interpret the text of § 924(e)(2)(B)(ii) as written, but rather infused a "similar in kind" requirement onto it. It did this to effectuate what it perceived to be what "Congress intended" in enacting the ACCA. Begay, 128 S.

---

[26]Indeed, we caution that Chambers does not say empirical evidence is always required. Rather, it says "[t]he upshot is that the study strongly supports the intuitive belief that failure to report does not involve a serious potential risk of physical injury." 129 S. Ct. at 692.

Ct. at 1587.

We have no trouble concluding that the willful decision not to follow a police officer's signal is "purposeful." And it cannot, under <u>Chambers</u>, be characterized as either "passive" or a crime of "inaction." 129 S. Ct. at 691-92. The motorist makes a deliberate choice to disobey a police officer's signal. Disobedience by continuing to drive at any speed is not passive. The conduct is purposeful and intentional.

However, disobeying a police officer's signal and continuing to drive on, without high speed or reckless conduct, is not sufficiently aggressive and violent enough to be like the enumerated ACCA crimes. Or as the Supreme Court put it in <u>Begay</u>, such conduct does not "show an increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger." <u>Begay</u>, 128 S. Ct. at 1587. It is not "the deliberate kind of behavior associated with violent criminal use of firearms." <u>Id.</u> It is not the type of conduct that one hears about and remarks, "that's the kind of thing an armed career criminal would do." <u>See</u> <u>id.</u> at 1586 ("[S]uch crimes are characteristic of the armed career criminal, the eponym of the statute." (quotation marks omitted)).

Of course, our conclusion would be different were the statute to criminalize

conduct that, in the ordinary case, involves an offender stepping on the gas and driving away recklessly without regard for the safety of others. Such callousness and indifference to the lives of others smack more of the kind of person that might "deliberately point the gun and pull the trigger." Id. at 1587. But a disobedient driver's failure to accelerate to a high rate of speed or to drive recklessly signals a different type of criminal and suggests an unwillingness to engage in violent conduct. A person who refuses to stop and drives on, without anything more, is, under Florida law, a felon. But that kind of person is not, in our mind, cut from the same cloth as burglars, arsonists, extortionists, or those that criminally detonate explosives. The fleeing crime in § 316.1935(2) seems more appropriately characterized as the crime of a fleeing coward—not an armed career criminal bent on inflicting physical injury.

In any event, the government has the burden. And based on the limited record before us, it has not shown that someone who has violated § 316.1935(2) has a future propensity for violent conduct. Id. at 1586. Given that we look only to how this Florida crime is committed in the ordinary case, and that we have no empirical data to help us, it requires too much of a leap to conclude that one who violates § 316.1935(2) is the kind of person likely to commit a crime of violence.

We do not minimize the risks associated with an offender who has a § 316.1935(2) conviction. Rather, we hold only that, based on the record before us, the government has not shown that a violation of § 316.1935(2) is "roughly similar in kind" to the other "purposeful, violent, and aggressive" crimes of arson, burglary, extortion, or the criminal use of explosives enumerated in § 924(e)(2)(B)(ii). A § 316.1935(2) crime does not fall within the scope of the kind of crimes that the ACCA was intended to reach. See Begay, 128 S. Ct. at 1584-86.

## G. Other Circuit Courts

We are not the first court to address whether willfully fleeing and eluding a police officer in a motor vehicle is a violent felony. And it appears that we are at odds with all but one other circuit that has addressed this issue. See United States v. Roseboro, 551 F.3d 226, 234-41 (4th Cir. 2009);[27] United States v. West, 550

---

[27]Technically, Roseboro is not inconsistent with our opinion here. But we liberally include it with the other circuit cases that have taken a position inconsistent with ours. In Roseboro, the Fourth Circuit remanded the case to the district court for a determination of whether the underlying conviction was for an intentional or unintentional violation of South Carolina's failure-to-stop-for-blue-light law. 551 F.3d at 243. At the same time, the Fourth Circuit clarified that, in its view, an intentional violation of South Carolina's law would be a violent felony within the meaning of the ACCA. Id. at 241 ("We also note that our decision today is consistent with decisions from our sister circuits."). But arguably, the Fourth Circuit's statements on intentional conduct were dictum since it was unable to determine whether an intentional violation was before it.

South Carolina's statute in Roseboro provides:
In the absence of mitigating circumstances, it is unlawful for a motor vehicle driver, while driving on a road, street, or highway of the State, to fail to stop when signaled by a law enforcement vehicle by means of a siren or flashing light. An attempt to increase the speed of a vehicle or in other manner avoid the pursuing law

35

F.3d 952, 960-63 (10th Cir. 2008);[28] <u>United States v. Spells</u>, 537 F.3d 743, 750-53

(7th Cir. 2008); <u>Powell v. United States</u>, 430 F.3d 490, 491-92, (1st Cir. 2005);[29]

<u>United States v. Kendrick</u>, 423 F.3d 803, 808-09 (8th Cir. 2005);[30] <u>United States v.</u>

---

enforcement vehicle when signaled by a siren or flashing light is prima facie evidence of a violation of this section. Failure to see the flashing light or hear the siren does not excuse a failure to stop when the distance between the vehicles and other road conditions are such that it would be reasonable for a driver to hear or see the signals from the law enforcement vehicle.
S.C. Code Ann. § 56-5-750(A).

[28]Utah's statute in <u>West</u> provides:
(a) An operator who receives a visual or audible signal from a peace officer to bring the vehicle to a stop may not:
 (i) operate the vehicle in willful or wanton disregard of the signal so as to interfere with or endanger the operation of any vehicle or person; or
 (ii) attempt to flee or elude a peace officer by vehicle or other means.
(b)(i) A person who violates Subsection (1)(a) is guilty of a felony of the third degree.
Utah Code Ann. § 41-6a-210(1).

[29]Maine's statute prohibits "driving at a reckless rate of speed while being pursued by a police vehicle making use of its siren and blue light." <u>Powell</u>, 430 F.3d 490 (citing Maine Revised Statutes § 2501-A(3) (superseded)).

[30]Oregon's statute in <u>Kendrick</u> provides:
(1) A person commits the crime of fleeing or attempting to elude a police officer if:
(a) The person is operating a motor vehicle; and
(b) A police officer who is in uniform and prominently displaying the police officer's badge of office or operating a vehicle appropriately marked showing it to be an official police vehicle gives a visual or audible signal to bring the vehicle to a stop, including any signal by hand, voice, emergency light or siren, and either:
 (A) The person, while still in the vehicle, knowingly flees or attempts to elude a pursuing police officer; or
 (B) The person gets out of the vehicle and knowingly flees or attempts to elude the police officer.
(2) It is an affirmative defense to a prosecution of a person under this section that, after a police officer operating a vehicle not marked as an official police vehicle signaled the person to bring the person's vehicle to a stop, the person proceeded lawfully to an area the person reasonably believed was necessary to reach before

Martin, 378 F.3d 578, 582-84 (6th Cir. 2004);[31] United States v. Howze, 343 F.3d

919, 921-22 (7th Cir. 2003).[32]  But see United States v. Kelly, 422 F.3d 889, 892-

---

stopping.
(3) The offense described in this section, fleeing or attempting to elude a police officer, is applicable upon any premises open to the public and:
> (a) Is a Class C felony if committed as described in subsection (1)(b)(A) of this section; or
> (b) Is a Class A misdemeanor if committed as described in subsection (1)(b)(B) of this section.
Or. Rev. Stat. § 811.540.

[31]Michigan's statute in Martin provides:
(1) A driver of a motor vehicle who is given by hand, voice, emergency light, or siren a visual or audible signal by a police or conservation officer, acting in the lawful performance of his or her duty, directing the driver to bring his or her motor vehicle to a stop shall not willfully fail to obey that direction by increasing the speed of the vehicle, extinguishing the lights of the vehicle, or otherwise attempting to flee or elude the police or conservation officer. This subsection does not apply unless the police or conservation officer giving the signal is in uniform and the officer's vehicle is identified as an official police or department of natural resources vehicle.
. . . .
(3) Except as provided in subsection (4) or (5), an individual who violates subsection (1) is guilty of third-degree fleeing and eluding, a felony punishable by imprisonment for not more than 5 years or a fine of not more than $5,000.00, or both, if 1 or more of the following circumstances apply:
(a) The violation results in a collision or accident.
(b) A portion of the violation occurred in an area where the speed limit is 35 miles an hour or less, whether that speed limit is posted or imposed as a matter of law.
(c) The individual has a prior conviction for fourth-degree fleeing and eluding, attempted fourth-degree fleeing and eluding, or fleeing and eluding under a current or former law of this state prohibiting substantially similar conduct.
Mich. Comp. Laws § 750.479a(1) & (3).

[32]Wisconsin's statute in Howze provides:
No operator of a vehicle, after having received a visual or audible signal from a traffic officer, or marked police vehicle, shall knowingly flee or attempt to elude any traffic officer by willful or wanton disregard of such signal so as to interfere with or endanger the operation of the police vehicle, or the traffic officer or other vehicles or pedestrians, nor shall the operator increase the speed of the operator's vehicle or

95 (9th Cir. 2005).[33]

But on closer examination, the split is not as marked as it seems. First, only three of these circuit cases were decided after Begay. Therefore, only three analyzed whether willfully fleeing met Begay's third requirement–that the crime must be "similar in kind" to the other crimes enumerated in § 924(e)(2)(B)(ii). See Roseboro, 551 F.3d at 240-41; West, 550 F.3d at 960-61; Spells, 537 F.3d at 752. The four pre-Begay cases, Howze, Martin, Kendrick, and Powell, are incomplete as they only involved questions of risk assessment–not comparisons of the crime to other purposeful, violent, and aggressive felonies embodied in the residual clause. Therefore, the pre-Begay cases supply only half of the equation.

Second, none of these cases had the benefit of Chambers. And all of them relied on a blanket assumption Chambers has since called into question. That is, Chambers rejected the view–dominant in virtually every circuit–that all escape-like

extinguish the lights of the vehicle in an attempt to elude or flee. Wis. Stat. § 346.04(3).

[33]Washington's statute in Kelly provides:
Any driver of a motor vehicle who willfully fails or refuses to immediately bring his vehicle to a stop and who drives his vehicle in a reckless manner while attempting to elude a pursuing police vehicle, after being given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a class C felony. The signal given by the police officer may be by hand, voice, emergency light, or siren. The officer giving such a signal shall be in uniform and the vehicle shall be equipped with lights and sirens.
Wash. Rev. Code § 6.61.024(1).

38

crimes are violent felonies.  See Chambers, 129 S. Ct. at 691-93.  And nearly every circuit finding willfully eluding crimes to be violent felonies relied on the view that such crimes–as subsets of the crime of escape–are necessarily violent felonies.  See Howze, 343 F.3d at 921-22 ("Thus, if all escapes are violent crimes, all flights to avoid arrest must be violent crimes."); Martin, 378 F.3d at 582-83 ("In this regard, fleeing and eluding resembles escape . . . ."); Kendrick, 423 F.3d at 809 ("The conduct associated with the commission of felony fleeing calls to mind the risks associated with escape . . . .  [E]very escape, even the most peaceable escape, is a powder keg, which may or may not explode into violence and result in physical injury to someone at any given time, but which always has the serious potential to do so." (quotation marks and citation omitted)); Powell, 430 F.3d at 491 ("In Winn, we endorsed the broad proposition that any 'escape scenario' was like a 'powder keg,' ready to explode into violence when officers attempted to recapture the escapee.  The reasoning set forth in Winn concerning escape offenses extends easily to evasive driving offenses." (citations omitted)); West, 550 F.3d at 963 ("Many of these decisions from other circuits draw analogies between convictions for eluding police and convictions for escape from police custody or jail, which courts have also treated as presenting a serious potential risk of physical injury to another.  The analogy is apt.  Like those circuits, we, too, have recognized that

every escape scenario is a powder keg. . . ." (quotation marks and citation omitted)).[34] Therefore, after <u>Chambers</u>, courts must examine the particular form of escape at issue on its own merits.[35]

Third, statistics about the potential risk of physical injury have taken on a heightened role in recent years. Whatever we may think about injecting statistics into statutory construction, we cannot ignore that the Supreme Court has relied on statistical evidence each time it has revisited the scope of the residual clause in the last three years. Although <u>Begay</u> and <u>Chambers</u> imposed no rule requiring the government to present statistical evidence on the question of whether a particular crime poses a serious potential risk of physical injury, it is noteworthy that none of

---

[34]In anticipation of <u>Chambers</u>, the <u>West</u> court noted that "at least for the time being, we must continue to apply our prior precedent." 550 F.3d at 963 n.9. But the Tenth Circuit panel did state that "[e]ven if the Supreme Court concludes that an escape conviction does not categorically present a serious potential risk of physical injury to another, we would conclude that a Utah conviction for failing to obey an officer's command would categorically present a serious potential risk of physical injury to another." <u>Id.</u>

[35]<u>Chambers</u> has already spawned a reconsideration of circuit precedent involving escape crimes. See <u>United States v. Oaks</u>, – F.3d –, 2009 WL 290512, at *1 (6th Cir. Feb. 9, 2009) (remanding for determination of whether defendant's felony conviction for knowingly escaping from the custody of the sheriff's department "qualifies as 'violent'" because the appellate court was "unable to determine whether, at the time of his escape, [defendant] was held in 'secure custody,' 'law enforcement custody,' or 'nonsecure custody,'" and noting <u>Chambers</u>'s consideration of "empirical evidence of how often different types of 'escapes' led to injury"); <u>United States v. Pearson</u>, – F.3d –, 2009 WL 211940, at **2-3 (8th Cir. Jan. 30, 2009) (stating "<u>Chambers</u> overrules this circuit's precedent that all escapes–including failures to return or report to custody–are crimes of violence, but leaves intact our precedent holding that escape from custody is a crime of violence," and remanding for determination of whether the defendant's prior conviction was a crime of violence).

the circuit cases listed above, with the exception of United States v. Spells, 537

F.3d 743 (7th Cir. 2008), made any mention of statistical evidence, which the

Supreme Court has now thrice thrown into the analytical mix.

At any rate, the more pertinent case is United States v. Spells, as it came

after Begay and used statistics to support its conclusion. In Spells, the defendant

was convicted of the federal offenses of robbery, felon in possession of a firearm,

and "brandishing a firearm during and in relation to a crime of violence in

violation of 18 U.S.C. § 924(c)(1)(A)(ii)." 537 F.3d at 744. The Seventh Circuit

addressed whether Spells's prior conviction under an Indiana statute making it a

felony to resist law enforcement, see Ind. Code § 35-44-3-3(b)(1)(A),[36] was a

---

[36]Indiana's statute in Spells provides:
A person who knowingly or intentionally:
(1) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties;
(2) forcibly resists, obstructs, or interferes with the authorized service or execution of a civil or criminal process or order of a court; or
(3) flees from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop[.]
Ind. Code § 35-44-3-3(a). Indiana law treats these three crimes as "Class A misdemeanor[s], except as provided" in § 35-44-3-3(b)(1)(A). Subsection (b)(1)(A) provides that the offense under subsection (a), the willful fleeing crime, is a "Class D felony if . . . the offense is described in subsection (a)(3) and the person used a vehicle to commit the offense[.]" Ind. Code § 35-44-3-3(b)(1)(A).

"violent felony" under the ACCA.[37]

The Seventh Circuit determined that the crime of resisting law enforcement was a violent felony for a number of reasons. First, it emphasized that such conduct is done "knowingly or intentionally" and is the product of a "purposeful decision to flee from an officer." Spells, 537 F.3d at 752 (quotation marks omitted). Second, "such conduct, when committed with a vehicle, is inherently aggressive, despite Indiana law's absence of a requirement that the conduct endanger others." Id. (quotation marks omitted). The Seventh Circuit emphasized that "[t]aking flight calls the officer to give chase, and aside from any accompanying risk to pedestrians and other motorists, such flight dares the officer to needlessly endanger himself in pursuit." Id. Third, the Seventh Circuit opined that individuals who choose to flee an officer are more likely to use guns to resist arrest if they have one. Id. at 752-53.

In reaching this conclusion, the Seventh Circuit cited statistical evidence, compiled by the Department of Justice, showing that "one out of every four state

_____

[37]Although Spells argued that the district court erred by failing to determine what subsection of the statute he was actually charged with, he did not contest the fact that violating either Ind. Code. § 35-44-3-3(a)(1) (forcibly resisting arrest) or § 35-44-3-3(a)(2) (forcibly resisting service of process) were violent felonies under the ACCA. Therefore, the Seventh Circuit only addressed whether Ind. Code. § 35-44-3-3(b)(1)(A) was a violent felony and assumed that the relevant crime was "fleeing a law enforcement officer in a vehicle." Spells, 537 F.3d at 750.

and federal inmates convicted for brandishing or displaying a firearm, had used the gun in this manner in an effort to 'get away.'" Id. at 752 (citing U.S. Department of Justice, Bureau of Justice Statistics Special Report: Firearm Use by Offenders 11, Table 14 ("Table 14") (Nov. 2001), http://www.ojp.usdoj.gov/bjs/pub/pdf/fuo.pdf). The Seventh Circuit's use of statistical evidence supports the view that it is important to use such evidence to assess risk in the ACCA context. But, for a number of reasons, we believe that the statistical evidence used by the Seventh Circuit is not relevant to the crime here.

First, it appears that the Seventh Circuit impermissibly looked to Spells's underlying conviction of brandishing a firearm as part of its statistical analysis. That is, the Seventh Circuit used statistics showing whether persons convicted of brandishing a firearm would be likely to brandish a gun while willfully fleeing a police officer. Looking to the facts of Spells's conviction (the fact that he was charged with brandishing), as opposed to the criminal category of willfully fleeing, as defined under Illinois law, seems inconsistent with Begay and Chambers. Indeed, were we to take a similar approach, our decision would be easier. Harrison was convicted of possession of a firearm–a far cry from brandishing a firearm during an armed robbery as the defendant in Spells did.

Second, the data relied on by the Seventh Circuit does not address whether

individuals convicted of willfully fleeing police officers pose a serious potential risk of physical injury.[38] A more accurate study would have looked at the annual number of physical injuries caused by willful fleeing crimes and compared it to the annual number of willful fleeing crimes.[39]

Ultimately, the elements of Florida's statute, as well as the implications of the Supreme Court's decision in Begay and Chambers, drive our conclusions. We recount the decisions of other circuits to place our decision in the context of their

---

[38]To the extent that the Seventh Circuit used this data only to show, generally, that people who flee from officers are more likely to use a gun in the future, the use of this data was highly questionable. For starters, Table 14 only attempted to quantify how federal and state inmates, that possessed firearms during their current offense (whatever the offense was), used their firearms. See Table 14 ("Extent of firearm use during current offense for State and Federal prison inmates possessing a firearm, 1997"). Of those inmates, 18.9% of state inmates and 11.6% of federal inmates, according to interviews with those prisoners, brandished or displayed their guns to "get away." Even the phrase "get away," used in Table 14, tells us nothing about whether those prisoners used their guns while "getting away" on foot or in a motor vehicle. The data also say nothing about whether those felons were attempting to "get away" from a police officer on their tail, or whether they generally brandished the weapon while running away after they committed a crime.

[39]The Supreme Court's use of the Sentencing Commission report prepared in response to the Seventh Circuit's decision in Chambers provides insight into the relevant methodology for studying empirically whether a crime presents a serious potential risk of physical injury. See Report on Federal Escape Offenses 5. The Commission "identified every federal case in which the offender was sentenced in fiscal year 2006 or 2007 and for which the court" applied a sentencing guideline enhancement for "[e]scape, [i]nstigating or [a]ssisting [e]scape." Id. at 3. To assess risk, the "Commission identified three factors that may be indicative of whether the escape or attempted escape involved conduct that presents a serious potential risk of injury to another." Id. at 5 (quotation marks and brackets omitted). It examined whether the crime involved the use of force, a dangerous weapon, or injury. Id. As to "injury," the report found that factor present where "the sentencing documentation indicated that the offender caused any bodily injury (including death) to another in connection with the escape." Id.

efforts to appropriately classify the crime of willful fleeing in the face of ever developing Supreme Court precedents.

## III. CONCLUSION

For the reasons stated above, we vacate Harrison's sentences and remand this case for resentencing without the ACCA's increased penalties.

**VACATED AND REMANDED.**